## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

RONALD GAINES, as Personal
Representative for the Estate of
RONALD POWERS, Deceased,

      Plaintiff,

v.

COUNTY OF WAYNE, et al.,

      Defendants.

Case No. 20-cv-11186
Hon. Mark A. Goldsmith
Mag. David R. Grand

---

FIEGER, FIEGER, KENNEY &
HARRINGTON P.C.
David A. Dworetsky (P67026)
Attorney for Plaintiff
19390 W. Ten Mile Rd.
Southfield, MI 48075
(248) 355-5555
d.dworetsky@fiegerlaw.com

WAYNE COUNTY CORP. COUNSEL
Jason Harrison (P62765)
Attorney for Wayne County Def.
500 Griswold St., 30th Floor
Detroit, MI 48226
(313) 224-3610
jharrison@waynecounty.com

CHAPMAN LAW GROUP
Ronald W. Chapman Sr., M.P.A.,
LL.M. (P37603)
Jonathan C. Lanesky (P59740)
Attorney for Wellpath, LLC and
Latanya Meadows, R.N.
1441 W. Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
rchapman@chapmanlawgroup.com
jlanesky@chapmanlawgroup.com

---

## DEFENDANTS WELLPATH, L.L.C.; AND LATANYA MEADOWS, R.N.'S MOTION TO PRECLUDE PLAINTIFF FROM ELICITING EXPERT TESTIMONY FROM PLAINTIFF'S EXPERT, RALF SALKE, R.N.

NOW COMES Defendants WELLPATH, L.L.C. ("Wellpath") and

LATANYA MEADOWS, R.N. ("Defendants"), by and through their counsel

Chapman Law Group, moves to preclude Plaintiff from eliciting expert witness testimony from Ralf J. Salke, R.N., pursuant to *Daubert v. Dow*, 509 U.S. 579 (1993) and Fed. R. Evid. 702, as follows:

1.      After learning that their originally retained expert, Betty Pederson-Chase, R.N., would no longer support her Affidavit of Merit or Expert Disclosure in this case, Plaintiff motioned this court to substitute expert witnesses.

2.      The Court granted Plaintiff's motion for leave to substitute expert witness, however, Plaintiff was required to pay the Wellpath Defendants' costs associated with the substitution. (**ECF No.  68**)

3.      Plaintiff's supplemental expert, Ralf J. Salke, R.N., BSN, CCHP-A., was retained pursuant to Fed. R. Civ. P. 26(a)(2)(B), to present evidence or offer testimony at trial under Fed. R. Evid. 702, 703, or 705.

4.      Fed. R. Evid. 702 states expert testimony is only admissible if it satisfies three broad requirements: (1) The witness offering the testimony must have knowledge, skill, experience, training, or education that qualifies the witness as an expert; (2) The witness's opinions must be reliable; and (3) The witness's opinions must assist the trier of fact. (*emphasis added*)

5.      District courts are the "gatekeep[ers]" of expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993). Federal Rule of Evidence 702 tasks them with determining whether an expert's "scientific, technical,

or other specialized knowledge" will assist the trier of fact in doing its job, and whether the expert's testimony "is the product of reliable principles and methods." Fed. R. Evid. 702(a), (c)

6.    Ralf Salke, R.N. is Plaintiff's sole expert retained to provide opinion testimony concerning the nursing care provided to Plaintiff's Decedent.

7.    Defendants move to preclude Plaintiff from eliciting expert opinions from Ralf Salke, R.N. on the basis that:

   a.  He lacks the knowledge, skill, experience, training, or education that's required to <u>qualify</u> as an expert.

   b.  His opinions are unreliable because he failed to articulate a reliable basis for his opinions, or specify the method used in arriving at his conclusions as required under *Daubert*.

   c.  His opinions are not relevant and would not assist the trier of fact.

8.    The undersigned counsel certifies that counsel communicated in writing with opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; opposing counsel thereafter expressly denied concurrence.

WHEREFORE, Defendants WELLPATH, L.L.C. ("Wellpath") and LATANYA MEADOWS, R.N. ("Defendants"), by and through their counsel, CHAPMAN LAW GROUP, respectfully request that this Honorable Court enter an

order to preclude Plaintiff from eliciting expert testimony from Plaintiff's expert,

Ralf Salke, R.N., pursuant to *Daubert v. Dow*, 509 U.S. 579 (1993), and Fed. R.

Evid. 702; and provide any and all such other relief as the Court deems just and

equitable.

 

 

                                    Respectfully submitted,

Dated: February 28, 2022          /s/ Jonathan C. Lanesky
                                    Ronald W. Chapman Sr., M.P.A.,
                                    LL.M. (P37603)
                                    Jonathan C. Lanesky (P59740)
                                    Attorneys for Wellpath, LLC and
                                    Latanya Meadows, R.N.
                                    1441 West Long Lake Rd., Suite 310
                                    Troy, MI 48098
                                    (248) 644-6326
                                    rchapman@chapmanlawgroup.com
                                    jlanesky@chapmanlawgroup.com

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

RONALD GAINES, as Personal
Representative for the Estate of
RONALD POWERS, Deceased,

    Plaintiff,                         Case No. 20-cv-11186
                                     Hon. Mark A. Goldsmith
v.                                      Mag. David R. Grand

COUNTY OF WAYNE, et al.,

    Defendants.

---

FIEGER, FIEGER, KENNEY &
HARRINGTON P.C.
David A. Dworetsky (P67026)
Attorney for Plaintiff
19390 W. Ten Mile Rd.
Southfield, MI 48075
(248) 355-5555
d.dworetsky@fiegerlaw.com

WAYNE COUNTY CORP. COUNSEL
Jason Harrison (P62765)
Attorney for Wayne County Def.
500 Griswold St., 30th Floor
Detroit, MI 48226
(313) 224-3610
jharrison@waynecounty.com

CHAPMAN LAW GROUP
Ronald W. Chapman Sr., M.P.A.,
LL.M. (P37603)
Jonathan C. Lanesky (P59740)
Attorney for Wellpath, LLC and
Latanya Meadows, R.N.
1441 W. Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
rchapman@chapmanlawgroup.com
jlanesky@chapmanlawgroup.com

---

**BRIEF IN SUPPORT OF DEFENDANTS WELLPATH, L.L.C.; AND
LATANYA MEADOWS, R.N.'S, MOTION TO PRECLUDE PLAINTIFF
FROM ELICITING EXPERT TESTIMONY FROM PLAINTIFF'S
EXPERT RALF SALKE, R.N.**

**PROOF OF SERVICE**

## <u>TABLE OF CONTENTS</u>

INDEX OF AUTHORITIES.................................. **Error! Bookmark not defined.**

INDEX OF EXHIBITS ......................................... **Error! Bookmark not defined.**

STATEMENTS OF ISSUES PRESENTED .......... **Error! Bookmark not defined.**

CONTROLLING/APPROPRIATE AUTHORITY FOR RELIEF SOUGHT **Error! Bookmark not defined.**

I.   STATEMENT OF FACTS .............................. **Error! Bookmark not defined.**

II.  LEGAL STANDARD ................................... **Error! Bookmark not defined.**

III. LEGAL ARGUMENT.................................... **Error! Bookmark not defined.**

   A.  Ralf Salke, R.N. is not qualified to offer expert witness testimony concerning matters outside correctional healthcare policies and quality management...**Error! Bookmark not defined.**

   B.  Ralf Salke, expert opinions are not reliable nor relevant pursuant to Daubert and should be excluded. ...................................... **Error! Bookmark not defined.**

IV. Conclusion ......................................................................................................20

# INDEX OF AUTHORITIES

**Cases**

*Best v. Lowe's Home Ctrs*., Inc., 563 F.3d 171, 177 (6th Cir. 2009)......................19

*Brainard v. Am. Skandia Life Assur. Corp*., 432 F.3d 655, 657 (6th Cir. 2005)) ...19

*Carroll v. Otis Elevator Co*., 896 F.2d 210, 212 (7th Cir. 1990))..........................12

*Daubert v. Merrell Dow Pharm, Inc*., 509 U.S. 579, 113 S. Ct 2786 (1993) . passim

Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). ...............................................12

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-530 (6th Cir. 2008),.. vi, 9, 12

*Jones v. Lincoln Elec. Co*., 188 F.3d 709, 723 (7th Cir. 1999) ...............................12

Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)......................................11

*Newell Rubbermaid, Inc. v. Raymond Corp*., 676 F.3d 521, 527 (6th Cir. 2012)...19

*R.C. Olmstead, Inc., v. CU Interface*, LLC, 606 F.3d 262, 271 (6th Cir. 2010) .....19

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670-672 (6th Cir. 2010)....................11

*Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005)......................11

United States v. Bonds, 12 F.3d 540, 558 (6th Cir. 1993)......................................10

*United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004)............................19

*United States v. Melcher*, 672 F. App'x 547, 552 (6th Cir. 2016). .........................15

*Woods v. Lecureax*, 110 F.3d 1215 (6th Cir.1997).................................................15

**Statutes**

MCL § 333.20141 .......................................................................................................1

MCL § 333.21513 .......................................................................................................1

**Rules**

110 F.3d at 1221......................................................................................................15

Fed. R. Civ. P. 26(a)(2)(B) .......................................................................................2

Fed. R. Evid. 702 ............................................................................................. passim

## <u>INDEX OF EXHIBITS</u>

**EXHIBIT A**  **Wellpath Medical Records**

**EXHIBIT B**  **Deposition Transcript of Ralf Salke, R.N., dated February 11, 2022**

**EXHIBIT C**  **Expert Report of Ralf Salke, R.N., dated October 8, 2021**

**EXHIBIT D**  **Deposition Transcript of Corporal Steven Hunter, dated July 21, 2021**

**EXHIBIT E**  **Deposition Transcript of LaTanya Meadows, R.N., dated July 20, 2021**

## **STATEMENTS OF ISSUES PRESENTED**

SHOULD THE COURT PRECLUDE PLAINTIFF'S EXPERT RALF SALKE, R.N. FROM OFFERING EXPERT OPINIONS CONCERNING ALLEGED CONSTITUTIONAL VIOLATIONS, STANDARD OF CARE VIOLATIONS AND/OR CAUSATION PURSUANT TO *DAUBERT* AND FED. R. EVID. 702?

DEFENDANTS STATE:                              YES.
PLAINTIFF STATES:                               NO.

## <u>CONTROLLING/APPROPRIATE AUTHORITY FOR RELIEF SOUGHT</u>

Fed. R. Evid. 702 states expert testimony is only admissible if it satisfies three broad requirements: (1) The witness offering the testimony must have knowledge, skill, experience, training, or education that <u>qualifies</u> the witness as an expert; (2) The witness's opinions must be <u>reliable</u>; and (3) The witness's opinions must assist the trier of fact.

*Daubert v. Merrell Dow Pharm, Inc*., 509 U.S. 579, 113 S. Ct 2786 (1993) and Fed. R. Evid. 702) require that this Court, "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."

"The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-530 (6th Cir. 2008), citing Fed. R. Evid. 702.

## I.  STATEMENT OF FACTS

On July 16, 2020, Plaintiff filed his First Amended Complaint alleging hospital malpractice pursuant to MCL § 333.20141 and MCL § 333.21513 against Wellpath, medical malpractice, gross negligence and general negligence against R.N. Meadows, and vicarious liability for medical malpractice gross and general negligence against Wellpath. (**ECF No. 14, PageID.88-133**). Plaintiff further alleges that Defendants breached their duty when they failed to comply with the applicable standards of care in their care and treatment of Mr. Powers. (**ECF No. 14, PageID.118-128**).

Ronald Powers (DOB 5/12/50) was sixty-seven (67) years old when he was arrested during a drive home from hemodialysis treatment on **December 8, 2017,** after failing to use a turn signal and subsequent discovery of an outstanding warrant. He was then transported and booked into the Wayne County Detention Facility at **12:08 p.m**.

Review of past medical records revealed that Mr. Powers past medical history included the need for hemodialysis due to end-stage renal disease (ESRD), metastatic hepatocellular carcinoma, papillary renal cell carcinoma, and hepatitis C.

Shortly after his arrival at the jail, Mr. Powers was moved to the Infirmary at **12:18 p.m**. (**ECF No. 14**) Wellpath progress notes completed by Registered Nurse (R.N.) CJ Long outline that Mr. Powers was then brought to the infirmary clinic

area. Mr. Powers reported that he was a dialysis patient undergoing hemodialysis three (3) days per week at DaVita Harper Woods on Tuesdays, Thursdays, and Saturdays. A dialysis catheter was documented as being present in his right upper chest.

His vital signs included a blood pressure of 194/90, heart rate 60, respiratory rate 18, and temperature 98 degrees. Mr. Powers reported taking medications at home including Nifedipine, Hydralazine, Clonidine, Coreg, Imdur and Nitroglycerin. R.N. Long verified these prescriptions with Harper Pharmacy. Mr. Powers also stated that he had a recent diagnosis of cancer and was also diabetic. He reported that he used ten (10) units of insulin every night at home. His current blood sugar registered at 93. Finally, Mr. Powers also reported taking methadone (opiate) with his last dose being "yesterday." However, he denied having any current symptoms of opiate withdrawal. While R.N. Long documented that Mr. Powers did not appear to be in any acute distress, a provider was called for orders which included the initiation of the opiate withdrawal protocol (COWS protocol) and referral to see a provider at sick call to further evaluate his various medical needs. (**Exhibit A, p. 48**).

At **4:38 p.m.**, Nurse Practitioner (N.P.) Teri Massey evaluated Mr. Powers. Mr. Powers vital signs at that point were noted as blood pressure 240/99, heart rate 54, respiratory rate 16, and temperature 98 degrees. N.P. Massey documented that

Mr. Powers' medications would be ordered except for his blood pressure medication, as she did not want his blood pressure to drop too low. She indicated that she was "on call" all weekend and could add/order blood pressure medication if his blood pressure remained elevated. She also ordered blood pressure monitoring. Included in her notes was Mr. Powers' acknowledgement of recent diagnoses of liver and adrenal cancer. He reported having had chemotherapy in 2016 and was scheduled to start again in December 2017. His hemodialysis catheter and treatment were also noted, as well as his history of high blood pressure, diabetes, and methadone use for pain related to his cancer. Notes indicate that the hemodialysis nurse was contacted to schedule hemodialysis for the following day. N.P. Massey obtained a Release of Information (ROI) from Mr. Powers to request his outside records from both DaVita Dialysis and his physician. (**Exhibit A, pp. 50-51**)

At **5:21 p.m.**, R.N. Shippings completed the Receiving Screening questionnaire that is usually done whenever an arrestee arrives at the jail facility. It is designed to determine any urgent, emergent, or chronic/ongoing needs that an individual may have to further determine his/her healthcare needs. Typically, this is the first medical questionnaire asked of a newly arrested individual; however, in this instance, Mr. Powers was instead taken immediately to the infirmary/clinic and was evaluated by both a registered nurse and nurse practitioner due to his multiple

medical issues. R.N. Shippings then completed the Receiving Screening about an hour after he had already been fully evaluated as noted above.

Past medical history information is included in the Receiving Screening questionnaire, as well as a suicide screening for which Mr. Powers scored "0" – as Mr. Powers denied all thoughts or intentions of committing suicide. He was noted to be alert, oriented, logical, and appropriate. He signed the form as requested. R.N. Shippings placed Mr. Powers on the referral list to continue to be seen by providers for all his chronic care conditions (**Exhibit A, p. 12**). An additional progress note timed at **5:28 p.m.**, further outlined that Mr. Powers had renal failure and required hemodialysis three (3) times weekly. R.N. Shippings also documented confirmation that Mr. Powers had been seen by the on-site provider, Nurse Practitioner Massey, and orders for Mr. Powers medications had been received. (**Exhibit A, p. 47**).

On **December 9, 2017 at 4:53 p.m.**, Mr. Powers was undergoing his dialysis treatment, and the dialysis nurse contacted R.N. Boone to report that Mr. Powers' blood pressure was 257/100. The dialysis nurse also contacted the nephrologist and received orders for blood pressure medication to be given. Mr. Powers' dialysis run was only two (2) hours (from 4:30 p.m. – 6:30 p.m.) *per his request* because he stated he was detoxing and wanted to stop his dialysis treatment. Mr. Powers was receiving detox medications as ordered to help alleviate his withdrawal symptoms. His blood

pressure was later rechecked at **5:58 p.m.** with a call to the nurse practitioner reporting the reading. (**Exhibit A, p. 43**),

On **December 10, 2017 and December 11, 2017**, Mr. Powers continued to have his vital signs, blood sugars, and withdrawal symptoms monitored. He received medications to help alleviate his withdrawal symptoms from December 8, 2017 through December 11, 2017, and his COWS withdrawal scores were recorded as being from 0 – 4 (mild) until monitoring was discontinued on December 11, 2017 (**Exhibit A, pp. 30, 97**).

On **December 11, 2017**, Mr. Powers had been in court and upon his return to the jail at **4:00 p.m.**, he refused his scheduled dialysis treatment because he felt that he was going to be released later that evening (**Exhibit A, p. 69**). Mr. Powers signed an AMA (Against Medical Advice) form with the notation that he was scheduled to have dialysis three (3) times per week with four (4) hour treatments each time for a total of twelve (12) hours per week. However, he was refusing due to his believed pending release, and he indicated that he would go to his usual dialysis center (DaVita Harper Woods) the next day (**Exhibit A, p. 68**).

Mr. Powers was not released from the jail that evening as he had anticipated. At **2:57 a.m. (now December 12, 2017)**, Corporal Steven Hunter authored an Incident Report describing Mr. Powers' behavior as "erratic" inside his housing unit, Infirmary Room 4. Corporal Hunter stated that Mr. Powers was tampering with the

television set, pacing, and standing over his cellmates invading their personal space. Mr. Powers was also taking their personal items and keeping his cellmates awake by talking to himself. However, Corporal Hunter also reported that he did not personally witness any of these behaviors, but rather they were reported to him by the cellmates. Corporal Hunter stated that he was concerned for Mr. Powers' safety as his cellmates were irritated and were starting to threaten Mr. Powers (**Exhibit D, p. 36-37:16-4**).

Corporal Hunter called the nursing staff and reported that Mr. Powers was acting "weird." (**Exhibit E, p. 39:9-16**). Corporal Hunter reported that he was aware diabetics can become disoriented and delusional if/when their blood sugar drops, so Corporal Hunter wanted to have a nurse check Mr. Powers to see if his behavior had a medical origin (**Exhibit D, p. 45:12-21**).

R.N. Meadows responded to the Infirmary. Mr. Powers was sitting quietly on his bed when she arrived. R.N. Meadows completed a focused assessment based upon the specific report from Corporal Hunter. She obtained a set of vital signs which were within normal parameters and checked Mr. Powers blood sugar, which was normal, with a reading of 93. R.N. Meadows asked Mr. Powers several questions about how he was feeling to which he responded "ok." She asked if he was in pain, and he said no. R.N. Meadows found him to be alert and oriented with no signs of hyperglycemia (high blood sugar) or hypoglycemia (low blood sugar) and not experiencing any pain (**Exhibit A, p. 100, Exhibit E, pp. 39:9-16; 41:19**).

Corporal Hunter corroborated this testimony in his deposition outlining that R.N. Meadows checked Mr. Powers' blood sugar, obtained vital signs, and asked Mr. Powers questions. Corporal Hunter also stated the Mr. Powers was acting quiet while R.N. Meadows was doing her assessment (**Exhibit D, pp. 51:12-21; 52:17-21; 80:13-15**).

R.N. Meadows told the officer that Mr. Powers seemed fine based upon her focused assessment; however, if anything changed or if he continued with "weird" behavior to let her know (**Exhibit E, p. 42:1-25**).

Corporal Hunter then concluded that Mr. Powers' actions were behavioral and decided to move Mr. Powers to a medical holding cell for his own safety since he was creating issues with his cellmates (**Exhibit D, p. 81:1-4**).

R.N. Meadows was able to visualize Mr. Powers being escorted by the officers to the medical holding cell as she was in the process of performing Intake Screenings on other new arrestees at that time (**Exhibit E, p. 85:8-12**).

After placing Mr. Powers in the medical holding cell, Corporal Hunter returned to double check the number on the cell to find Mr. Powers standing at the cell front. (**Exhibit D, p. 65:18-66:5**).

Approximately, twenty (20) to thirty (30) minutes later, (**4:00 a.m.**) during security rounds, Mr. Powers was discovered laying on his back with blood pooling around his head and was nonresponsive. Nursing staff was called and responded.

Resuscitative efforts followed including cardiopulmonary resuscitation (CPR), use of an automatic external defibrillator (AED), and the activation of Emergency Medical Services/Ambulance (EMS).

At **4:15 a.m.**, EMS arrived, took over medical care, and transported Mr. Powers to Detroit Receiving Hospital. Resuscitative efforts continued; however, interventions were unsuccessful, and Mr. Powers was pronounced dead at **4:50 a.m.** by Dr. Matthew Hedge.

The Medical Examiner's report described the cause of death as being due to exsanguination (death caused by loss of blood) because of a severed hemodialysis catheter. The report also noted that Mr. Powers had many underlying comorbid conditions, such as enlargement of his heart, congestion in his lungs, high blood pressure, cardiovascular disease, cancer, and cirrhosis of the liver. He was physiologically unable to tolerate the acute blood loss from the severed catheter which was compounded by his multiple pre-existing conditions listed above.

On January 5, 2018, twenty-four (24) days after the death of Ronald Powers, LaTanya Meadows, R.N., added a late entry note for December 12, 2017, which indicated that she was notified by an officer regarding a request for a blood sugar assessment of a patient. She writes that the blood sugar reading at that time was 93mg/dl, that Mr. Powers appeared to be Alert and Oriented times three (x3), had no

signs or symptoms of hypo/hyperglycemic reaction, and that Mr. Powers denied pain at the time.

## II. <u>LEGAL STANDARD</u>

*Daubert v. Merrell Dow Pharm, Inc*., 509 U.S. 579, 589 (1993) requires that this Court, "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."

Under the *Daubert* standard, the factors that may be considered in determining whether the methodology is valid are: (1) whether the theory or technique in question can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential error rate; (4) the existence and maintenance of standards controlling its operation; and (5) whether it has attracted widespread acceptance within a relevant scientific community.

"The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-530 (6th Cir. 2008), citing Fed. R. Evid. 702.

## III. <u>LEGAL ARGUMENT</u>

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> b) the testimony is based on sufficient facts or data;
>
> c) the testimony is the product of reliable principles and methods;
>
> d) and the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; see also *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993).

Rule 702 assigns the district court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"—a kind of "gatekeeping role." *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 597 (1993). In this role, district courts consider several factors that the *Daubert* Court identified, including whether the expert's methods are testable and subject to peer review. *Id.* at 593–94; see also *United States v. Bonds*, 12 F.3d 540, 558 (6th Cir. 1993) (identifying and discussing the so-called "*Daubert* factors").

This Court's duty as the gatekeeper to scientific evidence, requires this Court to assess whether the opinions are actually supported by science and not just accept

the opinions because of the nature of the expert's qualifications: "The trial court's gatekeeping function requires more than simply taking the expert's word for it. [A court being] presented with only the experts' qualifications, their conclusions and their assurances of reliability [is not enough under *Daubert*]." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005). Further, Fed. R. Evid. 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Thus, an expert's opinion that is based upon speculation is not admissible, because "the courtroom is not the place for scientific guesswork, even of the inspired sort." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670-672 (6th Cir. 2010).

The reliability inquiry focuses on the methodology and principles which form the basis of the testimony, *Greenwell*, 184 F.3d at 497, and is designed to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). An expert's testimony must be based on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at

590. Neither *Daubert* nor the Federal Rules of Evidence requires a court to admit opinion evidence "that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

In determining whether an expert's opinion is reliable, the Court does not "determine whether it is correct, but rather [determines] whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal*, 527 F.3d at 529-30.

Here, Ralf Salke, R.N. is not qualified to offer expert witness testimony as he has not rendered any reliable opinions regarding standard of care or causation in his report, but at most, involve unreliable conclusory statements based on his limited review of the evidence in this case.

## A. Ralf Salke, R.N. is not qualified to offer expert witness testimony concerning matters outside correctional healthcare policies and quality management.

Fed. R. Evid. 702 requires that an expert have a requisite level of knowledge, skill, experience, training, and education to offer expert witness testimony. A witness's qualifications must correspond to the subject matter of his or her proffered testimony. *See Jones v. Lincoln Elec. Co*., 188 F.3d 709, 723 (7th Cir. 1999) (citing *Carroll v. Otis Elevator Co*., 896 F.2d 210, 212 (7th Cir. 1990)) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the

witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.").

Mr. Salke is not qualified to testify to matters outside correctional healthcare policy and quality management. Said another way, Mr. Salke is not qualified to testify to matters which involve actual treatment of patients as is at issue in this case. According to his own bio, Mr. Salke was employed by Corizon Health/Correctional Medical Services for thirty-one (31) years. During that time, he held various positions to include Vice President of Operations, Group Vice President, Area Vice President and Senior Vice President-State Operations. Mr. Salke worked with both the Kansas and Missouri Department of Corrections and the Corizon team daily to lead the healthcare operations for those departments. As Senior Vice President, Mr. Salke led company initiatives for all State/Department of Corrections within the Corizon book of business. He also assisted with business development opportunities through his career within Corizon Health working on both Jail and Prison operations. Based on a review of his background, and requirements under Fed. R. Evid. 702, Mr. Salke is qualified to testify as to correctional health policy and management, however, he is not qualified to opine as to medical treatment provided by nurses. Mr. Salke hasn't provided hands-on medical treatment to any inmates for over twenty (20) years. (**Exhibit B, p. 27:14-17**) Mr. Salke's only relevant history related to

actual care and treatment of patients is during his time as a student nurse, which occurred well over thirty (30) years ago. (**Exhibit B, p. 23:17-20**).

Defendants acknowledge Mr. Salke possesses nursing degree. However, the mere fact that Mr. Salke has a nursing degree and treated patients thirty (20) years ago does not presently qualify him to offer expert witness opinions in a situation where the *medical treatment* provided to Plaintiff's Decedent is at issue. Mr. Salke offers expert testimony against Defendants, Meadows and Wellpath, Inc. While Mr. Salke has a nursing degree, he is a non-practicing nurse and under Fed. R. Evid. 702 is not qualified as he is not a practicing nurse and has no requisite superior experience or education in such areas. Mr. Salke testified that he has never conducted a COWS examination, an evaluation used in this case for opiate withdrawal (**Exhibit B, p. 88:15-16;**).

Further, The Court must compare the area in which Mr. Salke has superior experience or education, with the subject matter of the witness's testimony. Mr. Salke's opinions and conclusions, while mainly resorting to stating the actions of various Defendants and claiming they fell below the standard of care for nursing and correctional health care and demonstrate deliberate indifference, (**See Exhibit C, pp. 16-19**) Mr. Salke hasn't provided hands on treatment to patients in over twenty (20) years, and even when he was providing treatment it was as an administrator, not a licensed registered nurse. Mr. Salke's area of expertise and education is of

14

correctional health policy and management, which he did opine stating that he did not review the Wellpath, Inc., or Wayne County Jail's clinical guidelines and or policies and procedures (**Exhibit B, pp. 133:3-7; 56-57:18-9t**).

Not only is Mr. Salke not qualified to testify to matters outside correctional healthcare policies and management, but he is not permitted to make legal conclusions. Expert witnesses are not permitted to make legal conclusions. *United States v. Melcher*, 672 F. App'x 547, 552 (6th Cir. 2016). An expert makes a legal conclusion when "he defines the governing legal standard or applies the standard to the facts of the case." *Id*. (emphasis added) (citations omitted). Here, Mr. Salke's opinion is littered with references that various Defendants actions or inactions demonstrated deliberate indifference to Mr. Powers' serious medical needs. (*see* **Exhibit C**).

The Sixth Circuit in *Woods v. Lecureax*, 110 F.3d 1215 (6th Cir.1997), affirmed the trial court's decision to prohibit an expert witness's use of the term "deliberate indifference." The court observed that "whether a prison official acted with deliberate indifference depends on that official's state of mind. Thus, by expressing the opinion that [the defendant] was deliberately indifferent, [the expert] gives the false impression that he knows the answer to this inquiry, which depends on [the defendant's] mental state." 110 F.3d at 1221.

Mr. Salke is not qualified to offer expert opinions in areas that do not involve correctional healthcare policy and management.

**B.** **Ralf Salke, R.N.'s expert opinions are not reliable nor relevant pursuant to *Daubert* and should be excluded.**

Ralf Salke R.N.'s proposed expert testimony is irrelevant, unreliable, and not supported by information in the record to be admitted at trial for the purpose of aiding the factfinder in deciding whether the failure of the R.N. Meadows to assess Mr. Powers resulted in his untimely death. Here, Mr. Salke's expert report has not one articulated basis for his opinions and makes no mention of the methods he used in arriving at his conclusions. Fed. R. Evid. 702 explains that "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702, advisory committee's notes (2000 amendment). Yet, "[i]f the witness is relying solely or primarily on experience, then the witness must explain <u>how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts</u>." *Id.* (emphasis added). First, Mr. Salke offers no sufficient data or facts that would prove such opinions were the product of reliable principles and methods. Mr. Salke offers no studies, publications, peer-reviewed articles, in support of his opinions, and provided no such documents during his deposition, thus presumably he relies on his experience to offer such opinions. When questioned as to the basis of his opinions

16

against R.N. Meadows, Mr. Salke testified that in his opinion the standard of care required R.N. Meadows to do a nursing assessment, which included going through head-to-toe functions, including vitals (**Exhibit B, p. 127:3-10.**).

When an expert offers opinions based on experience Fed. R. Evid. 702 requires Mr. Salke to explain <u>how</u> his experience led him to the conclusions reached, why such experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. Mr. Salke has failed to tie any specific experience with any of the conclusions reached in this matter. Mr. Salke's opinions are simply a summary of R.N. Meadows' actions with regard to Mr. Powers and concludes that such actions fall below the standards of correctional nursing and demonstrate deliberate indifference to Plaintiff's serious medical needs.

Mr. Salke's opinions and conclusions can be summarized into broad categories as follows: R.N. Salke's opinions or R.N. Meadows are listed below:

- R.N. Meadows failed to obtain Mr. Powers' vital signs in the early morning hours of December 12, 2017, at least once. If she had, R.N. Salke is sure she would have provided a late entry for those as well since she went through the process of adding the finger stick result. Even a pulse oximetry reading on room air would have been very helpful at this point.
- R.N. Meadows failed when she allowed the Custody staff to move Mr. Powers from the infirmary 4 Ward to a medical holding cell and not contacting the on-call provider or mental health professional for additional dialogue.

(**Exhibit C**) He lists his opinions about Wellpath, LLC as follows:

17

- Failure to charting on Mr. Powers' intake screening;
- Failure to prescribe methadone as part of Mr. Powers' detoxing regime;
- Failed to capture Mr. Powers' intake vitals correctly;
- Failed to assign Mr. Powers to the infirmary for his dialysis port and instead placed him in general population, as he was weak and for his own safety;
- Failed to follow up on dialysis treatment of Mr. Powers on December 9th or December 11th, nor did they review/acknowledge his lack of treatment and take additional actions for the care and wellbeing of Mr. Powers.
- Failed to adequately assess Mr. Powers during the early hours of December 12, 2017;
- Failed to call for a behavior health consult on an urgent basis to review and or examine Mr. Powers;
- Failed to contact a medical provider and discuss the plan by the officers.

(**Exhibit C**). Mr. Salke's opinions are not supported by any data, facts, or based on a scientific basis for such opinions. Mr. Salke's opinions are conclusory and devoid of any specific experience to support such conclusions. Mr. Salke opines that Mr. Powers' death was preventable yet fails to provide any evidence that Defendants actions or inactions proximately caused his death. Mr. Salke testified that he relied upon the allegations contained in the Amended Complaint. (**Exhibit B, p. 86:5-13**) Her further testified that he did not read any of the depositions, statements and outside medical records in this matter. (**Exhibit B, p. 47-50:24-2**) The Sixth Circuit has noted that an expert's "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity" can render

18

his opinion inadmissible. *Newell Rubbermaid, Inc. v. Raymond Corp*., 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best v. Lowe's Home Ctrs*., Inc., 563 F.3d 171, 177 (6th Cir. 2009)). Here, Mr. Salke's opinion fails to consider the facts and rather resorts to interpretations of the facts in light of what he believes is an appropriate medical assessment, despite not treating a patient in over twenty (20) years. Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *R.C. Olmstead, Inc., v. CU Interface*, LLC, 606 F.3d 262, 271 (6th Cir. 2010) (citing *Salgado v. Gen. Motors Corp*., 150 F.3d 73, 742 n. 6 (7th Cir. 1998)). "[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation." *Id.* (citing *Brainard v. Am. Skandia Life Assur. Corp*., 432 F.3d 655, 657 (6th Cir. 2005)). Excluding an expert's *ipse dixit* opinion testimony maintains the integrity of *Daubert's* requirements because "[i]f admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). Mr. Salke's *ipse dixit* opinions must be excluded because he fails to outline a line of reasoning arising from a logical foundation.

Lastly, Mr. Salke's opinions are not relevant, in that they will not assist the trier of fact understand the evidence or to determine a fact at issue. Fed. R. Evid. 702. Mr. Salke's opinions are just summaries of actions and conclusions that those

19

actions fell below the standard of care. Mr. Salke's opinions are no different from what Plaintiff's lawyers will argue during their closing, and his conclusions do nothing to advance a material aspect of Plaintiff's case. Thus, any opinions or conclusions Mr. Salke would not assist the jury and are therefore not relevant and should be excluded.

## **CONCLUSION**

Mr. Salke is not qualified to offer expert opinions against the Defendants, and his opinions must be stricken for the following reasons:

- Mr. Salke is not qualified to testify as to matters outside correctional healthcare policy and quality management because he does not have the requisite education or experience to testify as to medical treatment of patients pursuant to *Daubert*.

- Mr. Salke cannot opine regarding legal conclusions and cannot state whether certain actions constitute deliberate indifference.

- Mr. Salke's opinions are unreliable because they are not based on scientific evidence or peer-reviewed evidence; therefore, his testimony must be stricken under Fed. R. Evid. 702 and *Daubert.*

- Mr. Salke's opinions are unreliable because he fails to opine <u>how</u> his experience supports the basis of his claims and conclusions.

- Mr. Salke's opinions are not relevant and would not assist the trier of fact

  pursuant to Fed. R. Evid. 702.

                              Respectfully submitted,
                              CHAPMAN LAW GROUP

Dated: February 28, 2022      /s/ Jonathan C. Lanesky
                              Ronald W. Chapman Sr., M.P.A.,
                              LL.M. (P37603)
                              Jonathan C. Lanesky (P59740)
                              Attorneys for Wellpath, LLC and
                              Latanya Meadows, R.N.
                              1441 West Long Lake Rd., Suite 310
                              Troy, MI 48098
                              (248) 644-6326
                              rchapman@chapmanlawgroup.com
                              jlanesky@chapmanlawgroup.com

**<u>PROOF OF SERVICE</u>**

I hereby certify that on February 28, 2022 I presented the foregoing paper to the Clerk of the Court for filing and uploading to the ECF system, which will send notification of such filing to the attorneys of record listed herein and I hereby certify that I have mailed by US Postal Service the document to the involved non participants.

/s/ Jonathan C. Lanesky
Ronald W. Chapman Sr., M.P.A.,
LL.M. (P37603)
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
jlanesky@chapmanlawgroup.com

## <u>LOCAL RULE CERTIFICATION</u>

I, Jonathan Lanesky, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3)

/s/ Jonathan C. Lanesky
Ronald W. Chapman Sr., M.P.A.,
LL.M. (P37603)
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
jlanesky@chapmanlawgroup.com
