# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

RONALD GAINES, as Personal
Representative for the Estate of
RONALD POWERS, Deceased,

      Plaintiff,

v.

COUNTY OF WAYNE, et al.,

      Defendants.

Case No. 20-cv-11186
Hon. Mark A. Goldsmith
Mag. David R. Grand

---

| | |
|---|---|
| FIEGER, FIEGER, KENNEY & HARRINGTON P.C.<br>David A. Dworetsky (P67026)<br>Attorney for Plaintiff<br>19390 W. Ten Mile Rd.<br>Southfield, MI 48075<br>(248) 355-5555<br>d.dworetsky@fiegerlaw.com | CHAPMAN LAW GROUP<br>Ronald W. Chapman Sr., M.P.A., LL.M. (P37603)<br>Jonathan C. Lanesky (P59740)<br>Attorney for Wellpath, LLC and Latanya<br>Meadows, R.N.<br>1441 W. Long Lake Rd., Suite 310<br>Troy, MI 48098<br>(248) 644-6326 |
| WAYNE COUNTY CORP. COUNSEL<br>Jason Harrison (P62765)<br>Attorney for Wayne County Def.<br>500 Griswold St., 30th Floor<br>Detroit, MI 48226<br>(313) 224-3610<br>jharrison@waynecounty.com | rchapman@chapmanlawgroup.com<br>jlanesky@chapmanlawgroup.com |

## EXHIBIT G TO DEFENDANTS WELLPATH, L.L.C.; AND LATANYA MEADOWS, R.N.'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT
# G



October 8, 2021

David Dworetsky
Fieger Law Offices
19390 West Ten Mile Road
Southfield, MI 48075

RE: **Ronald Gaines, as Personal Representative for the Estate of Ronald Powers, Deceased, v. County of Wayne, et al., 20-cv-11186, Eastern District of Michigan**

Dear Mr. Dworetsky:

My name is Ralf J. Salke, RN, BSN, CCHP-A. I am an independent nurse consultant working in correctional health care. I am the Founder and Managing Director of the Salke Advisory Group, which assists entities within corrections and health care services.

My prior employment was with Correctional Medical Services (CMS) / Corizon Health, from December 18, 1988, to September 6, 2019. CMS changed its name to Corizon Health on June 3, 2011, after a buyout of Prison Health Services. I served in Vice President capacities within Corizon including Vice President of Operations, Area Vice President, Group Vice President and Senior Vice President of State Operations. While I was an operator, I held a Missouri Registered Nurse (RN) License. That license is active today with no actions or restrictions against it and I can practice in 35+ other states under the Nurse Compact Agreement including the US Territory of Guam.

I was also the Vice President of Business Development for Rx Outreach, the nation's largest nonprofit pharmacy ranked number 3 by Money Magazine in 2020 and 2021. I left Rx Outreach in July 2021 after one year. I was responsible for securing business for our Healthy Reentry within Corrections, clinic acquisitions and developing clients for our wholesale distribution strategy(s). Rx Outreach was previously a division of Express Scripts based out of St. Louis, Missouri.

I am currently the Chair of the Academy of Correctional Health Professionals. I have served on/off again in this role since 2003 as well as its Treasurer. I have also served on the Certified Correctional Health Professionals (CCHP) Board of Trustees from 2010 through 2016 for the National Commission on Correctional Health Care (NCCHC).



723 Sardonyx Dr
Jefferson City MO 65109

573-821-4609

RSalke@aol.com

This Board oversees and manages the certifications of Correctional Physicians, Nurses, Mental Health Personnel and Advanced Certification (CCHP-A), a certification I currently possess. I am a surveyor for the NCCHC in the past, but currently on inactive status during Covid. I am also the recipient of the Visionary Award in Health Care Excellence from the Missouri Hospital Association (Rural) in 2001.

My education and work experience are outlined on my curriculum vitae. I have completed one publication which is also in my CV.

# TABLE OF CONTENTS

Question Presented.................................................................................... Page  4

Documents Reviewed................................................................................Page  7

Facts, Wellpath LLC f/k/a Correct Care Solutions.....................................Page  8
Facts, LaTanya Meadows, RN..................................................................... Page 13
Facts, Chardonnay Dialysis......................................................................... Page 14
Facts, Wayne County Officers..................................................................... Page 15

Opinions About Wellpath LLC f/k/a Correct Care Solutions................................. Page 16
Opinions About LaTanya Meadows, RN...............................................................Page 18
Opinions About Wayne County Officers.................................................... Page 19

Conclusion................................................................................................. Page 20

## QUESTION PRESENTED

On December 8, 2017, Ronald Powers was driving home when he was stopped by Wayne State Police and then arrested for a twenty-two (22) year old outstanding warrant.  Mr. Powers was arrested and taken to Wayne County Baird Detention Facility.  Mr. Powers' date of birth is 5-12-1950 and he was a 67-year-old Hispanic male.  At his booking into Wayne County, it is noted of his past medical history including Diabetes II, Hypertension, Renal Dialysis, History of Smoking, Liver and Adrenal Cancer, End Stage Kidney Disease and Methadone for pain/withdrawal treatment.  Medications that Mr. Powers was on prior or during confinement included:

1. Methadone
2. Benadryl
3. Calcium Acetate
4. Catapres
5. Coreg
6. Humulin R
7. Hydralazine
8. Isosorbide
9. Lasix
10. Nifedipine
11. Protonix
12. Tramadol
13. Nitroglycerin
14. Senna
15. Zofran

His chronic conditions and medical issues were listed as the following on December 8, 2017:

1. Diabetes (RBS was 93 prior to arrest, self-reported)
2. Hypertension
3. Withdrawal Treatment
4. History of Liver and Adrenal Cancer (past Chemotherapy with more to begin in December 2017)
5. Dialysis (Tuesday, Thursday, and Saturday treatments)
6. End Stage Kidney Disease
7. Chronic Smoker
8. Hepatitis C (HCV + with past treatment)
9. Noted that Patient appears "weak"

The intake records further states that a clinical opiate withdrawal scale (COWS) was to be used to measure opiate withdrawal symptoms.  Mr. Powers intake vital signs include.

- B/P:              **194/90**
- Pulse:            60
- Respirations:     18
- Temperature:      **Not recorded**
- Weight:           173lbs
- Height:           **Not recorded**
- BMI:              25.5
- Pulse Ox:         98% (I am assuming on room air)

Per the receiving screening form, Mr. Powers exhibited no suicidal thoughts, was not talking strangely, and was alert, appropriate and logical.  It is noted that he will need <u>chronic care follow up and was cleared and placed in general population.</u> Intake did not note his temporary dialysis shunt located in his upper right chest area.

On December 9, 2017, during dialysis, it is reported that Mr. Power's had not received his methadone and his B/P was 254/89.  Dr. Hillyer was notified, and Mr. Powers requested that dialysis only run for 2 hours vs 4 hours because he was in detox.  Mr. Powers was moved from general population to the infirmary for additional monitoring of his blood pressure.

Mr. Powers' COWS score was not taken by Wellpath, and no dialysis was provided at all on December 11, 2017.  By midnight, Mr. Powers was offered as needed medications including Meclizine, (used to prevent/treat nausea, vomiting, and dizziness), Imodium A-D and Tylenol.  Mr. Powers was offered an electrolyte drink.  However, he had a COWS score of "0", with all responses charted as "no" to the behavioral health screen questions.  During this review, I could not find in the Medication orders or in the Medication Administration Records that Methadone was provided to Mr. Powers during his confinement.  There is a notation from RN Boone (CCS Medical Record P. 47) stating, "Inmate on detox protocol and was medicated as ordered".  I can only assume the medication was Catapres 0.2 mg X 1.  RN Boone further comments that, "Blood pressure will be checked in 45 min".

In the evening of December 11, 2017, Mr. Powers expressed a desire to go home and argued with a correctional officer for several hours.  At approximately 2:30 am on

December 12, 2017, Mr. Powers began displaying erratic behavior.  Officer Carey reported that he was tampering with the TV and pacing and standing over other inmates in the ward, invading their personal space.  Mr. Powers also took the padding from the wheelchair of another inmate and was keeping the other inmates awake by talking to himself.  Mr. Powers was convinced one of the officers was going to shoot him.  A witness described Mr. Powers' behavior as he "seemed out of his mind".

At 2:45 am, RN LaTanya Meadows after being advised by Corporal Hunter of Mr. Powers erratic behavior, checked his blood glucose level, and allegedly the reading was normal.  With no additional review of vital signs, intake records or medical records concluded Mr. Powers was "fine" and was from Infirmary room #4 to medical holding cell #1.  At 3:00 am, Mr. Powers was observed by Officer Maddox standing at the bars and mumbling to himself.  RN Meadows was made aware of this behavior and no additional review of records, vital signs or discussion with her supervisor Nurse Sherrod occurred.  Two officers have informed RN Meadows of his altered behavioral state.

At 4:00 am during a security round, Mr. Powers was found to be lying on the floor of his cell on his back with blood pooling around his head area, unresponsive.  On duty nurses in the infirmary as well as Detroit Fire Department were alerted of his "emergent situation".  During CPR that was initiated by the nursing staff, it is noted that blood is streaming out from Mr. Powers dialysis port until such time that it was clamped off by Nurse Clark.  There appears to be a discrepancy when the codes to the Fire Department and to the Infirmary nurses was initiated.  The Fire Department arrived at 4:16 am, and departed the jail for Detroit Receiving Hospital, where further resuscitative efforts were futile, and Mr. Powers was pronounced dead at 4:50 am.

Twenty-four (24) days after the death of Mr. Powers, RN Meadows added a late entry note for December 12, 2017, which indicated that she was notified by an officer regarding a request for a blood sugar assessment of a patient.  RN Meadows writes that the blood sugar reading at that time was 93 mg/dl and that Mr. Powers appeared to be alert and oriented times 3, had no signs or symptoms of hypo/hyperglycemic reaction and that Mr. Powers denied pain at the time.  Officer Carey reported that RN Meadows checked Mr. Powers blood glucose level to ascertain whether his behavior was from low blood sugar, but his reading was normal.

With the death of Mr. Powers, was there deliberate indifference towards his serious medical needs at the time and after booking, during his Wayne County incarceration up to his demise?  Also, which individuals and entities could have contributed to Mr. Power's death and why?

I was retained by plaintiff's counsel, Fieger Law Firm, and asked to render expert opinions, using my education, training, and experience in correctional health care, as to what occurred during the four-day period.  I was asked to focus on both institution and individuals.

## DOCUMENTS REVIEWED

Mr. Power's attorney has made various files in this litigation accessible to me for my review in preparing my report.  I have found the following records most pertinent to my evaluation as an expert and have focused on and reviewed the following records:

### Administrative

- Notice of Intent to File
- Notice of Amended Complaint

### Medical Records

- Ronald Powers Medical Records, CCS
- Detroit Fire Department / EMS
- Davita Dialysis / Ronald Powers
- Chardonnay Dialysis / Ronald Powers

### Investigative Records

- Ronald Powers Medical Records, CCS
- Detroit Fire Department Response Record / Ronald Powers
- Davita Dialysis / Ronald Powers
- Chardonnay Dialysis / Ronald Powers
- Report of Diagnosis and Autopsy by Dr. Daniel Spitz / Ronald Powers
- Autopsy Report-Photos / Ronald Powers
- Death Certificate / Ronald Powers

### Policies and Procedures

- Clinical Guidelines for Withdrawal Management
- Standards for Health Services in Jails 2018, National Commission on Correctional Health Care
- Standards for Health Services in Jails 2014, National Commission on Correctional Health Care

- Standards for Opioid Treatment Programs in Correctional Facilities, 2016, National Commission on Correctional Health Care

**Miscellaneous**

- Google Search: Dialysis Treatment and Uremia Toxicity
- Google Search: Dialysis Patients with Hypertension and where their Blood Pressures need to be

## FACTS, WELLPATH LLC, f/k/a CORRECT CARE SOLUTIONS

Wellpath is the contracted medical and mental health provider for Wayne County Jail. They are responsible for comprehensive medical, mental health, pharmacy, dental, intake screening, off-site services for those inmates confined in this jail.  This includes providing all qualified staff on site by contract 24hrs x 7 days/week as well as their subsequent credentialing and training by position.  Wellpath follows the 2014 Standards for Jails by the National Commission on Correctional Health Care (NCCHC) at the time of Mr. Powers demise.

Wellpath is required to screen arrestees medically and for mental health issues that could be detrimental for confinement.  Prior to booking the arrestee may be sent to a local hospital for evaluation and clearance. If the arrestee is returned from a community provider, their admission to the facility is predicated on written medical clearance from that provider.  Upon return a medical survey/screening should also occur by health care professionals.  If they are not available after hours, then the screening should be completed by trained officer and the record(s) should be reviewed by health care staff upon their arrival for duty.  Receiving screening is to fulfill several purposes (2014 NCCHC Standards in Jails):

- <u>Identify and meet any urgent health needs of those being admitted</u>
- <u>Identify and meet any known or easily identifiable health needs that require medical intervention</u>
- Identify and isolate inmates who appear potentially contagious
- Obtain a medical clearance when necessary.
- <u>The disposition of the inmate (e.g., immediate referral to an appropriate health care service, placement in the general population) is appropriate to the findings of the receiving screening and is indicated on the receiving screening form.</u>

The site may or may not have a written policy for Withdrawal Management of any kind or complies with the NCCHC 2016 Standards for Opioid Treatment Programs in Correctional Facilities as none were made available to me for review.

Mr. Powers was admitted to Wayne County Jail on December 8, 2017, after a traffic stop for failure to use a turn signal. This traffic stop revealed a 22-year-old outstanding warrant for failure to attend a court ordered class. While Mr. Powers was being placed under arrest, his passenger, Monique Baker informed the Officer of his medical conditions, and his dialysis port was visible from his chest. Mr. Powers had his receiving screening completed by Wellpath RN Shippings. In addition, Mr. Powers daughter called the jail and advised them of her father's dialysis needs. The facility contacted Davita Dialysis and received records from his last 3 dialysis treatments. Those treatments were conducted on December 2, 5, and 7. Each treatment clearly lasted four (4) hours each. His labs and his B/Ps were charted at that time of each encounter.

Mr. Powers receiving screening form was completed by RN Shippings at Wayne County Jail. He answered **"YES"** to the following question, *"Have you ever or are currently being treated for: asthma, diabetes, seizure disorder, thyroid disorder, heart condition, high blood pressure, bleeding disorder or kidney disease"*. The Nurse placed **"NO"** on question 3 when asked, *"Are you currently taking any medication prescribed to you by a physician"?* Mr. Powers also answered **"YES"** to questions 7 and 8 regarding past exposure to Hepatitis C / treatment and a previous positive TB Skin test. Mr. Powers would later receive a chest x-ray for this past positive PPD test. Mr. Powers also acknowledged a renal diet and continues to smoke 3 cigarettes daily for the past 15 years. Mr. Powers denied any thoughts of suicide or potential for. His current Mental Status is as follows:

| | |
|---|---|
| **Orientation:** | **Alert** |
| **Affect:** | **Appropriate** |
| **Thought Process:** | **Logical** |
| **Speech:** | **Appropriate** |
| **Mood:** | **Appropriate** |
| **Activity / Behavior** | **Appropriate** |
| **Hallucinations:** | **"None indicated"** |

In addition, the Nurse indicated that Mr. Powers should have a referral to a medical provider and be placed in chronic care. It is also noted that no special needs were needed, and Mr. Powers could be placed in General Population.

At 2:50 PM on December 8, 2017, Mr. Powers experience a rise in B/P to 240/99. His Pulse Ox is at 97% (I am assuming on room air). ANP Massey has ordered clonidine 0.3mg every

8 hours but held it due to him receiving other medications and worried his pressure would go to low.  Also placed Mr. Powers on B/P monitoring for the next 5 days.

Nurse Long noted at 3:56 PM *pt to clinic, hx of Methadone use.  Last had yesterday. Denies s/s of withdrawal at this time.  Hx of Dialysis at Davita Harper Woods.  Port noted upper Rt chest.  Treatments Tuesday, Thursdays, and Saturdays.  No acute distress elevated BP (see vitals-194/90) meds verified through Harper Pharmacy.  Last had yesterday. Nifedipine ER 30 q day, Hydralazine 25 TID, clonidine .3 TID, Coreg 25 BID, Imdur 30 q day, nitro .4 PRN also recent dx of cancer.  Also, DM RBS 93 states taking NPH 10U HS.*

ANP Massey also noted his past subjective medical history at 4:38 PM *to include cancer of the liver and adrenal, past chemo in 2016 and is supposed to start chemo again in December 2017.  Also states that he is seeing Dr. Kamanos.  Patient is also ESRD on HD (hemodialysis), catheter RU chest wall, HTN, DM, <u>on methadone for pain of cancer</u>.  Pt states he had HD yesterday, HD nurse contacted for HD tomorrow.*
Objective notes are that **patient appears to be "WEAK"** and Nurse Long administered HTN medications.  Also noted patient is alert and oriented X 3.  During this review, I could not find in the Medication orders or in the Medication Administration Records that Methadone was provided to Mr. Powers during his confinement.  There is a notation from RN Boone (CCS Medical Record P. 47) stating, "Inmate on detox protocol and was medicated as ordered".  I can only assume the medication was Catapres 0.2 mg X 1.  RN Boone further comments that, "Blood pressure will be checked in 45 min".

Plan/assessment was *"health issues -ESRD on HD catheter RU chest wall, HTN, DM, methadone for pain of liver cancer and adrenal gland, ROI (Release of Information) for Kamanos and Davita records, meds ordered, COW started r/t methadone use, HD nurses notified.  Will schedule BP and BS checks daily x 5 days and f/u next week for ROI and further needs."* <u>Finger stick record in the housing unit was not completed in the evening of the 9th, morning of the 10th, evening of the 10th, morning of the 11th, evening of the 11th. On the morning of the 12th at 0430 it is noted Mr. Powers went out to the hospital.  There is no finger stick result. (CCS Medical Records, P. 54)</u>.  The infirmary log indicates the following finger stick results (CCS Medical Records, P. 55) for Mr. Powers:

| DATE | TIME | RESULTS |
|------|------|---------|
| 12/9/17 | 1600 | 84 |
| 12/10/17 | 0600 | 134 |
| 12/10/17 | 1600 | 172 (Legibility Issue reading result) |
| 12/11/17 | 0500 | 102 |
| 12/11/17 | 1600 | 88 |

**\*There is no medical record entry on 12/12/2017 by Nurse Meadows regarding BS results for Mr. Powers other than her 24-day late entry note dated 24 days later on January 5, 2018.**

On December 9, 2017, at approximately 12:18 PM, Mr. Powers' B/P was 254/89. He was moved from General Population to Room 4 of the Division 1 Infirmary for B/P monitoring x 5 days. Catepres 0.2 mg was administered. Mr. Powers would remain here until the early morning of December 12, 2017.

Mr. Powers signed a consent for dialysis treatment at Wayne County Jail under Chardonnay Dialysis at 1:30 PM. The procedure was explained to Mr. Powers by Dr. Hillyer and/or his medical staff according to the standard release. (CCS Medical Record P. 75). Mr. Powers and RN Doye signed the consent form. It is noted that the catheter placement (access port for dialysis) was a temporary one in his chest. The nursing notes by (no signature supplied) indicated "pt signed consent for dialysis, started treatment…..B/P 254/89 at start of treatment, pt stated he hasn't had his methadone and his increased B/P. Chardonnay staff informed Dr. Hillyer of increased B/P, no methadone today and his history of liver cancer". (CCS Medical Record P. 82). The physician progress notes are blank by Dr. Hillyer (CCS Medical Records P. 79-80). RN Doye entered a Telephone Order (TO) to begin 4 hours of dialysis on Mr. Powers. At 1:30, RN Doye entered another Telephone order to administer 0.2 mg of Catepres prior to beginning dialysis at 2:30 PM (CCS Medical Record P. 74).

After 2 hours of dialysis, Mr. Powers requested to be removed due to his detox at 4:30 PM. Dr. Hillyer was notified. At 4:53 PM, Mr. Powers B/P was recorded as 257/100. Catapres 0.2mg was ordered and administered. A refusal/against medical advice was signed by Mr. Powers and RN Doye. It was not countersigned or witnessed as the form indicates. No discussion with Mr. Powers by a licensed physician took place to discuss the issues of not completing dialysis per the orders of a physician (CCS Medical Record P. 88). Another Refusal/Release from Responsibility form was signed by Mr. Powers and RN Doye (CCS Medical Record P 90). This form explains issues from refusing dialysis, but the sections were not marked/checked to indicate they were discussed with the patient by RN Ndoye or anyone else. Also, Chardonnay and their staff had the dialysis records of Davita and showed that Mr. Powers had 4 hours of dialysis treatment on December 2, 5, and 7 at their Harper Wood Facility. Mr. Powers B/P at 5:58 PM was 226/86.

On December 11, 2017, Mr. Powers signed a refusal/against medical advice (CCS Medical Record P. 72). It is noted by Chardonnay Dialysis staff member RN Gary N. Doye that Mr. Powers needs dialysis 3 times per week at 4 hours per treatment for a total of 12.0 hours

per week.  Mr. Powers indicated he would "go to his center Davita Harper Wood tomorrow".  RN Gary Doye signed off along with Mr. Powers.  <u>RN Gary Doye also signed as the witness to his and Mr. Powers signature.</u>  RN Doye did not remind Mr. Powers that he only had 2-hour dialysis on December 9, 2017.  He also did not notify Mr. Powers' nephrologist nor the CCS Medical Director for addition discussions.  No other medical personnel were brought in for further discussion with Mr. Powers to discuss what could happen without his needed dialysis or to convince him to receive dialysis treatment.

Close to midnight on December 11, 2017, Mr. Powers B/P was 187/68, Pulse 82, Temperature 98 and his respirations were 20.  (CCS Medical Records P. 99).  Mr. Powers was given Meclizine, Imodium A-D and Tylenol.  He was offered an electrolyte drink.  It is noted his COWS score of zero (0) with all responses charted as "no" to the Behavioral Health Screen questions.

It is noted that after receiving the above medications, Mr. Powers was arguing with Officers about his desire to go home.  Around 2:30 AM, Mr. Powers began displaying erratic and disruptive behavior.  Officer Carey reported Mr. Powers was tampering with the television, pacing, and standing over other inmates in the ward, invading their personal space.  He also took the padding from the wheelchair of another inmate and was keeping the other inmates awake by talking to himself.  Mr. Powers also believed that one of the officers was going to shoot him.  A witness described Mr. Powers as he seemed **<u>out of his mind.</u>**  Around 2:45 AM, RN Meadows was advised by Corporal Hunter of Mr. Powers erratic behavior.  RN Meadows supposedly tested his blood sugar.  It is not documented in the infirmary log.  A 24-day late note is added by RN Meadows on January 5, 2018, into Mr. Meadows closed medical record (CCS Medical Record P. 43) indicating his Blood Sugar was **"93 mg/dl.  Patient appeared to be A&O X 3 at that time, no s/sx of hypo/hyperglycemic <u>reaction, Pt denies pain at this time".</u>**  There are no vital signs noted in the records made available to me to include B/P, P, R, T, or pulse oximetry.  Also, I find no additional follow up, review of intake records, dialysis records, assessments, or collegial discussions from RN Meadows regarding Mr. Powers reported behavior to any other medical staff to include on call personnel.  Around 2:57 AM, Mr. Powers was removed from the infirmary Ward 4 and placed in a medical holding cell.  This cell appears to be more remote and less observed than that of the Infirmary Ward.  I can find no discussion with the medical staff or a medical order from a physician to place Mr. Powers in this setting.  At 3 AM, Officer Maddox observed Mr. Powers standing in the back of the cell and mumbling to himself.  No addition actions or queries are recorded or interventions by custody / medical staff.

At 4:00 AM, Mr. Powers was observed lying on the floor of the holding cell on his back with blood pooling around his head area, unresponsive.  CPR appears not to have been initiated by the Officers but rather waited till Wellpath nursing staff arrived on the scene and began

CPR after assessing Mr. Powers.  I cannot determine if the officers supplied basic first aid to Mr. Powers from the records I reviewed.  Upon arriving on the scene and initiating CPR, the nursing staff had to clamp off Mr. Powers dialysis port as blood was exiting it so they may continue with the resuscitation efforts.  Detroit Fire Department was also notified and arrived on the scene around 4:16 AM.  Resuscitation continued by the Detroit Fire Department as they exited the facility enroute to Detroit Receiving Hospital where Mr. Powers was pronounced dead at 4:50 AM.

Autopsy reveals "death was caused by the exsanguination as a consequence of a severed hemodialysis catheter in the right upper chest due to end stage renal disease.  A laceration with associated abrasion was on the back of the head and is consistent with an injury sustained during a terminal fall.  It is unknown if the port was severed from catching on something within the holding cell or by the decedent himself, or if he understood the consequence (sic) such behavior".  It would be helpful to know if the holding cell had any furnishings that could have contributed to the catheter catching on it / or if a structure or furnishing could have contributed to the laceration behind his head.

## FACTS, LATANYA MEADOWS, RN

In the early morning hours of December 12, 2017, Mr. Powers was arguing with Officers about his desire to go home.  Around 2:30 AM, Mr. Powers began displaying erratic and disruptive behavior.  Officer Carey reported Mr. Powers was tampering with the television, pacing, and standing over other inmates in the ward, invading their personal space.  He also took the padding from the wheelchair of another inmate and was keeping the other inmates awake by talking to himself.  Mr. Powers also believed that one of the officers was going to shoot him.  A witness described Mr. Powers as he seemed **out of his mind.**  Around 2:45 AM, RN Meadows was advised by Corporal Hunter of Mr. Powers erratic behavior.  RN Meadows supposedly tested his blood sugar.  It is not documented in the infirmary log as is all the other results.  A 24-day late note is added by RN Meadows on January 5, 2018, into Mr. Meadows medical record (CCS Medical Record P. 43) indicating his Blood Sugar was **"93 mg/dl.  Patient appeared to be A&O X 3 at that time, no s/sx of hypo/hyperglycemic reaction, Pt denies pain at this time".**  Officer Carey reported that RN Meadows checked Mr. Powers blood glucose level to ascertain whether his behavior was from low blood sugar, but his reading was normal.  In most cases, medical records are closed after the death of a patient.  There were no vital signs noted in the records made available to me to include B/P, P, R, Pulse Oximetry, and T.  Also, I find no additional follow up, review of intake records, dialysis records, assessments, or collegial discussions from RN Meadows regarding Mr. Powers reported behavior.  Around 2:57 AM, Mr. Powers was removed from the infirmary Ward 4 and placed in a medical holding cell.  This cell appears to be more remote and less observed than that of the Infirmary Ward.  I can find no discussion with the medical staff or a medical order from a physician to place Mr. Powers

in this setting.  At 3 AM, Officer Maddox observed Mr. Powers standing in the back of the cell and mumbling to himself.  No addition actions or queries are recorded.

## FACTS, CHARDONNAY DIALYSIS

Mr. Powers signed a consent for dialysis treatment at Wayne County Jail under Chardonnay Dialysis at 1:30 PM.  The procedure was explained to Mr. Powers by Dr. Hillyer and/or his medical staff according to the standard release. (CCS Medical Record P. 75).  Mr. Powers and RN Doye signed the consent form.  It is noted that the catheter placement (access port for dialysis) was a temporary one in his chest. The nursing notes by (no signature supplied) indicated "pt signed consent for dialysis, started treatment…..B/P 254/89 at start of treatment, pt stated he hasn't had his methadone and his increased B/P. Chardonnay staff informed Dr. Hillyer of increased B/P, no methadone today and his history of liver cancer". (CCS Medical Record P. 82).  The physician progress notes are blank by Dr. Hillyer (CCS Medical Records P. 79-80).  RN Doye entered a Telephone Order (TO) to begin 4 hours of dialysis on Mr. Powers.  At 1:30, RN Doye entered another Telephone order to administer 0.2 mg of Catepres prior to beginning dialysis at 2:30 PM (CCS Medical Record P. 74).

After 2 hours of dialysis, Mr. Powers requested to be removed due to his detox at 4:30 PM. Dr. Hillyer was notified.  At 4:53 PM, Mr. Powers B/P was recorded as 257/100.  Catapres 0.2mg was ordered and administered. A refusal/against medical advice was signed by Mr. Powers and RN Doye.  It was not countersigned or witnessed as the form requires. No discussion with Mr. Powers by a licensed physician took place to discuss the issues of not completing dialysis per the orders of a physician (CCS Medical Record P. 88).  Another Refusal/Release from Responsibility form was signed by Mr. Powers and RN Doye (CCS Medical Record P 90).  This form explains issues from refusing dialysis, but the sections were not marked/checked to indicate they were discussed with the patient by RN Doye or anyone else.  Also, Chardonnay and their staff had the dialysis records of Davita and showed that Mr. Powers had 4 hours of dialysis treatment on December 2, 5, and 7 at their Harper Wood Facility.  Mr. Powers B/P at 5:58 PM was 226/86.

On December 11, 2017, Mr. Powers signed a refusal/against medical advice (CCS Medical Record P. 72).  It is noted by Chardonnay Dialysis staff member RN Gary Doye that Mr. Powers needs dialysis 3 times per week at 4 hours per treatment for a total of 12.0 hours per week.  Mr. Powers indicated he would "go to his center Davita Harper Wood tomorrow".  RN Gary Doye signed off along with Mr. Powers.  <u>RN Gary Doye also signed as the witness to his and Mr. Powers signature.</u>  RN Doye did not remind Mr. Powers that he only had 2-hour dialysis on December 9, 2017.  He also did not notify Mr. Powers' nephrologist nor the CCS Medical Director for addition discussions.  No other medical personnel were brought in for further discussion with Mr. Powers to discuss what could

happen without his needed dialysis.  Other medical staff were not brought in to discuss with Mr. Powers the complications that could arise by not completing his dialysis nor did anyone try to convince him to receive his dialysis treatment.

## FACTS, WAYNE COUNTY OFFICERS

On December 12, 2017, Mr. Powers was arguing with Officers about his desire to go home. Around 2:30 AM, Mr. Powers began displaying erratic and disruptive behavior.  Officer Carey reported Mr. Powers was tampering with the television, pacing, and standing over other inmates in the ward, invading their personal space.  Mr. Powers also took the padding from the wheelchair of another inmate and was keeping the other inmates awake by talking to himself.  Mr. Powers also believed that one of the officers was going to shoot him.  A witness described Mr. Powers as **"he seemed out of his mind"**.  Around 2:45 AM, RN Meadows was advised by Corporal Hunter of Mr. Powers erratic behavior.  RN Meadows supposedly tested his blood sugar.  It is not documented in the infirmary diabetic log as is all the other results (CCS medical Record P. 55).  A 24-day late note is added by RN Meadows on January 5, 2018, into Mr. Meadows medical record (CCS Medical Record P. 43) indicating his Blood Sugar was **"93 mg/dl.  Patient appeared to be A&O X 3 at that time, no s/sx of hypo/hyperglycemic reaction, Pt denies pain at this time".**  There are no vital signs noted in the records made available to me to include B/P, P, R, Pulse Oximetry, and T.  Also, I find no additional follow up, review of intake records, dialysis records, assessments, or collegial discussions from RN Meadows regarding Mr. Powers reported behavior.  Around 2:57 AM, Mr. Powers was removed from the Infirmary Ward 4 and placed in a medical holding cell.  This cell appears to be more remote and less observed than that of the Infirmary Ward.  I can find no discussion with the medical staff or a medical order from a physician to place Mr. Powers in this setting.  In addition, I did not see additional discussion amongst the custody staff since more than one officer observed Mr. Powers erratic behavior and Nurse Meadows found no objective findings based on her severely limited assessment.  At 3 AM, Officer Maddox observed Mr. Powers standing in the back of the cell and mumbling to himself.  No addition actions or queries are recorded.  This behavior is clearly different than the findings on the intake screening form from December 8, 2017 (CCS Medical Record P. 16).

At 4:00 AM, Mr. Powers was observed lying on the floor of the holding cell on his back with blood pooling around his head area, unresponsive. CPR appears not to have been initiated by the Officers but rather waited until Wellpath nursing staff arrived on the scene and began CPR after assessing Mr. Powers. First aid does not appear to have been initiated by the officers either.  Upon initiating CPR, nursing staff had to clamp off Mr. Powers' dialysis port as blood was exiting it so they may continue with resuscitation efforts.  Detroit Fire Department was also notified and arrived on the scene around 4:16 AM.  Resuscitation

continued by the Detroit Fire Department as they exited the facility enroute to Detroit Receiving Hospital where Mr. Powers was pronounced dead at 4:50 AM.

## OPINIONS ABOUT WELLPATH LLC, f/k/a CORRECT CARE SOLUTIONS

Issues began at intake involving Mr. Powers and his confinement at Wayne County Jail. Wellpath nurses repeatedly demonstrated a blatant disregard to Mr. Powers' medical needs by the following:

- Incorrectly answered Question #3 on Mr. Powers Intake Screening, "Are you currently taking any medication prescribed to you by a physician". The marked answer was "NO". Question number 1 of the intake screening form (CCS Medical Record P. 12 clearing inquiries about his chronic illness which is acknowledged by the answer as well as follow up throughout the entirety of the intake screening. Mr. Powers even discusses his diabetes, and his blood sugar results prior to arrest with the intake nurse.
- During his confinement, it is documented multiple times regarding Mr. Powers need for methadone and his detoxing regime. COWS documentation was initiated during the confinement, documentation within the medical records occurred but yet there is not documentation that methadone was ordered, given, or documented. Managing withdrawals for a confined individual is critical and crucial that it is overseen by a physician with frequent if not constant observation. <u>Wellpath staff appear to be confused on the purpose of Methadone as ANP Massey listed in her notes (CCS Medical Records P. 53) that Mr. Powers was receiving methadone for cancer pain.</u>
- Mr. Powers intake vital signs were not captured correctly. His temperature and height are part of the vital sign process. In addition, his B/P was 194/90 at intake and only increased from there to as high as 257/100. Renal and Hypertensive patients are at increased risks of a cardiovascular event if their systolic pressure remains at / over 180 for prolonged periods.
- Mr. Powers appeared "weak" (CCS Medical Record P. 53) and yet he was placed into General Population. It is noted that he has a temporary dialysis port protruding from his Right Upper Chest. The mere presence of this port and how dangerous it would be if pulled out by another inmate clearly indicated he should be confined to the medical unit upon his arrival for safety and observation not only for the port but for detox protocols as well. Mr. Powers indicated that he is on a renal diet and continues to smoke daily with the intake staff.

- Mr. Powers B/P only appears to have been at or below 180 (systolic) on one occasion during confinement which was on 12/10/17 at 1600 hours (CCS Medical Record P. 99).  All other documented B/Ps were well above a systolic reading of 180.
- No one can predict when an inmate will be released from confinement for various reasons outside their control.  Mr. Powers refused dialysis on 12/9/17 (two hours of the four-hour treatment indicating he was on detox therapy) and 12/11/17 indicating that he would seek treatment upon his release and receive treatment the next day at Davita Harper Wood Dialysis.  He was allowed to sign a release that was acknowledged by the Dialysis RN and countersigned as a witness by that same RN. If RN Doye was the only staff member in the unit, it is acceptable to have another staff member such as the Officer to witness the signatures. (2014 NCCHC Standards for Jails-Right to Refuse).  Mr. Powers was not refusing a simple appointment but rather **a life-threatening procedure** if he does not follow through with.  A witness signature would have been ideal in this situation.  In addition, Wellpath and Chardonnay staff did not carefully review the records and see that he was on dialysis for 4 hours each on December 2, 5, and 7, even while on methadone.  There is no additional review and the fact that Mr. Powers would not have had a complete treatment since 12/7/1, a huge Red Flag and concern for complications by not completing dialysis for up to 4+ days.  RN Doye did not contact Wellpath staff, a physician, Mr. Powers regular nephrologist, Dr. Kamenos, or asked another health care provider to speak with Mr. Powers regarding the toxicity of uremia that will build up by not completing this required treatment.  Nor did he have another staff member try and convince Mr. Powers to receive his life required procedure. Wellpath did not follow up on dialysis treatment of Mr. Powers on December 9th nor December 11th, nor did they review / acknowledge his lack of treatments and take additional actions for the care and well-being of Mr. Powers.
- Staff did not adequately assess Mr. Powers during the early morning hours of December 12, 2017.  While RN Meadows said she obtained a blood sugar lab value of 93 mg/dl, she failed to document it on the infirmary diabetic log like all the other results (CCS Medical Record P. 55).  It was not until 24 days after Mr. Powers death that she documented a late entry on 1/5/2018 revealing the lab. It is ok to render a late entry.  Twenty-four days for a late entry is suspect and even to remember the lab value after all that time is concerning.  If she obtained Mr. Powers vital signs, she didn't recall those into the record.  No other assessment or collaboration occurred regarding Mr. Powers "erratic behaviors".  Calling for a behavior health consult on an urgent basis to review / examine Mr. powers should have occurred. Even a telephone or telehealth encounter could have occurred.  There were at least

2 officers identifying this change in behavior and RN Meadows / Wellpath should have done more to review this change in mental status.  Intake screening clearing shows he was fine on 12/8/17 (CCS Medical Record P. 16).

- Mr. Powers was removed from the Infirmary 4 Ward to a medical holding cell with less oversight and observation.  Wellpath staff should have contacted a medical provided and discussed this plan by the officers with the provider.  A medical order moving the patient would have been prudent or an order to keep him where he was, and an order for additional assessments based on the officers/inmate's observations.  Unfortunately, moving Mr. Powers to the holding cell may have contributed to his death.

## OPINIONS ABOUT LATANYA MEADOWS, RN

RN Meadows was deliberately indifferent to Mr. Powers serious medical needs on the morning of December 12, 2017.  RN Meadows showed a blatant disregard for Mr. Powers reported mental health status and her credibility is suspect in this review.

- RN Meadows was provided with at least 2 reports from two different officers regarding Mr. Powers altered mental status.
- RN Meadows supposedly obtained a finger stick from Mr. Powers and that result was 93 mg/dl.  She did not document it on the infirmary diabetic log for Mr. Powers like all the other BS checks from 12/9/17 that were done twice per day (CCS Medical Record P. 55).
- It was not until 24 days later / after Mr. Powers passing that she remembered the result and provided a late entry into Mr. Powers electronic medical record.  This is interesting in that after a patient expires, even in the "free" world, the electronic medical record is locked so that entries cannot be made for obvious reasons.  I believe RN Meadows was contacted during the Morbidity/Mortality review of Mr. Powers and asked to supply any "missing" data or data that may have been forgotten.  It is acceptable to provide late entries into a patient's medical record, but these are usually hours or even a day late based on the events of the unit but not weeks to supply critical entries into the record.
- RN Meadows did not obtain Mr. Powers' vital signs in the early morning hours of December 12, 2017, at least once.  If she had, I am sure she would have provided a late entry for those as well since she went through the process of adding the finger stick result.  Even a pulse oximetry reading on room air would have been very helpful at this point.
- RN Meadows allowed the Custody staff to move Mr. Powers from the Infirmary 4 Ward to a medical holding cell through her lack of action(s).  RN Meadows did not

attempt to contact the on-call provider or mental health professional for additional discussions and dialogue. There appeared to be no communication or discussions with Custody about "next steps" in the care for Mr. Powers.

## OPINIONS ABOUT WAYNE COUNTY OFFICERS

It is clear the Sheriff of Wayne County Jail is responsible for the operations of the jail as well as the training and supervision of all staff within this facility. I believe the officers while trying to obtain assistance for Mr. Powers were indifferent to his serious medical needs in the early morning hours December 12, 2017.

- Multiple officers reported erratic on the part of Mr. Powers. Clearly his mental status was altered from the review completed on 12/8/17 at intake screening. The officers appear not to have escalated their concerns to their custody supervisors for additional discussion and / or communication with the health care staff or on-call providers.
- Custody officers moved Mr. Powers from a safe environment in Infirmary 4 Ward with immediate observation by staff/inmates to a medical holding cell with less oversight and observation.
- Custody only rounded on Mr. Powers at 0300 hours and again at 0400 hours. His 0300 encounter by Officer Maddox observed him in the rear of the holding cell, standing at the bars and mumbling to himself. No additional actions were taken on her part regarding the well-being of Mr. Powers.
- A medical emergency was initiated at 0400 by the rounding Officer. It was noted that Mr. Powers was lying on the floor of his cell on his back with blood pooling around his head area, unresponsive. Detroit Fire Department was activated as well.
- The rounding Officers or other custody staff first on the scene did not render basic first aid nor initiated CPR. All officers are trained in basic first aid. This is also a requirement by NCCHC (2014 NCCHC Standards for Jails). In addition, all staff are trained in CPR. The nursing notes for 12/12/17 indicates the Wellpath nursing staff-initiated CPR upon their arrival to the holding cell.

## CONCLUSION

Prior to confinement, Mr. Powers was leading a life where he his chronic conditions and hemodialysis was being managed and he was able to have a fairly normal life.  While he was receiving hemodialysis, Mr. Powers completed the full treatment all at the same time as undergoing detoxification treatment.  That all changed when he was arrested and was confined to the Wayne County Baird Detention Facility.

During receiving screening, errors occurred regarding documentation and little consideration for Mr. Powers chronic conditions, elevated B/P and his exposed catheter located in his upper right chest.  He was seen by a Nurse Practitioner Massey who indicated he looks weak and is on methadone for pain control of his cancer.  While this is incorrect as he was undergoing detox treatment, he was still cleared and placed in general population versus that of a safer unit such as the infirmary.  It would be 24 hours later that Mr. Powers would be admitted into Infirmary 4 Ward for monitoring of his blood pressures.

While I commend Wellpath and Chardonnay staff for obtaining Mr. Powers medical records and verifying his medications, I am not sure they were reviewed or considered them when delivering health care to him during his confinement.  The dialysis records from Davita clearly indicated that prior to confinement, Mr. Powers received full dialysis treatments 3 x per week for 4 hours each.  His last dialysis treatment was on December 7, 2017, and he was arrested on December 8, 2017.  Wellpath staff scheduled Mr. Powers for dialysis through their on-site contractor, Chardonnay.  Mr. Powers was allowed to discontinue dialysis treatment after 2 hours on December 9, 2017, and no dialysis treatment at all on December 11, 2017.  While a refusal was obtained and signed off by Mr. Powers and a dialysis nurse, the forms were not correctly/completed with detailed discussions of the adverse outcomes or potential of if treatment was not followed through.  Furthermore, the medical staff did not fully communicate to licensed physicians about Mr. Powers decision, nor did they have or attempt to have other staff speak to him about his decision to stop dialysis early and not receive dialysis at all.  There was no collegial dialogue regarding Mr. Powers from intake until his demise on the part of Wellpath.  I could not find any documentation from the Wellpath Medical Providers that they spoke to Mr. Powers regarding the potential consequences of his decision regarding dialysis treatment.

During his entire confinement, Mr. Powers Blood Pressure remained seriously elevated, especially regarding the systolic readings at over 180.  Literature demonstrates that

patients with prolonged elevation is at greater risk for cardiovascular events without proper treatment and monitoring.

In the early morning of December 12, 2017, multiple officers shared with RN Meadows of Mr. Powers erratic behavior and invading other patients' personal space by tampering with their property or interrupting their TV time / sleep. RN Meadows supposedly completed a fingerstick on Mr. Powers. NO other assessment, vital signs, or logging of that fingerstick into Mr. Powers diabetic finger stick log could be found. It was not until 24 days later, after Mr. Powers death, that the finger stick of 93 mg/dl was entered into a supposedly closed medical record as a late entry on January 5, 2018. Mr. Powers mental status at intake was documented in detail. His actions on the early morning of December 12, 2017, clearly contradicted those findings. Neither RN Meadows nor the officers communicated with their supervisors or sought additional consults from the on-call medical or mental health staff.

The officers moved Mr. Powers from Infirmary 4 Ward to a medical holding cell. There was no discussion with medical or an order from a licensed physician to move him from the safe confines of the infirmary to a less, safer cell / limited observation such as holding cell. Once in the cell, Mr. Powers was rounded on at 0300 still displaying "bizarre" behavior but yet no additional consultations with anyone from medical to security occurred. A round / observation an hour later by an officer revealed Mr. Powers laying on his back on the floor of his cell with pooling blood around his head. An emergency response was initiated but yet the officers did not render / initiate CPR but waited until the nursing staff arrived to clamp his catheter and then begin life saving measures. Mr. Powers was taken by the Detroit Fire Detroit in full arrest to a local hospital where he was pronounced dead at 0450 AM on December 12, 2017.

The medical, dialysis and custody staff had ample opportunities to identify deficiencies in care for Mr. Powers during his confinement. Overall, there was a failure to communicate with / amongst themselves about and with the patient from intake to his passing. Red flags plagued this patient with limited response(s) from Wellpath staff. Had Mr. Powers been placed in the infirmary immediately upon entry into Wayne County Jail, been monitored from that time for his Blood Pressures/treatment, his weakness been assessed, safety measures for his external catheter, engagement / additional follow up staff to Mr. Powers, had appropriate dialysis treatment and initializing discussions with him regarding the adverse outcomes of refusing such treatment, ensuring proper assessment of his altered mental status (including vital signs/calls to providers) and constant observation while in a holding cell, Mr. Powers in all likelihood would not have passed away in the early morning of December 12, 2017.

I affirm and certify under penalties of perjury pursuant to federal law and Michigan state law that the statements and opinions set forth in this report are true and accurate based on my review of the records of the case and my education, training, and experience.  I certify that with regard to any matters therein stated to be on information and belief, I believe them to be true.

Sincerely,

Ralf J. Salke, RN, BSN, CCHP-A
Founder / Managing Partner
Salke Advisory Group
MO Licensure # 2000172073