## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

RONALD GAINES, as Personal
Representative for the Estate of
RONALD POWERS, Deceased,

      Plaintiff,

v.

COUNTY OF WAYNE, et al.,

      Defendants.

Case No. 20-cv-11186
Hon. Mark A. Goldsmith
Mag. David R. Grand

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO THE
## WAYNE COUNTY DEFENDANTS' MOTION TO PRECLUDE
## TESTIMONY FROM PLAINTIFF'S EXPERTS
## DR. AARON WESTRICK AND RALF SALKE

Plaintiff RONALD GAINES, as Personal Representative for the Estate

of RONALD POWERS, deceased, for his Response in Opposition to the

Wayne County Defendants' Motion to Preclude Testimony from Plaintiff's

Experts Dr. Aaron Westrick and Ralf Salke, submits the following brief in

support, and states as follows:

I.    **Background**.

This case arises out of the tragic death of 67-year-old Ronald Powers on December 12, 2017, at the Wayne County Jail.  On December 8, 2017, Ronald Powers was driving home from dialysis treatment when he was pulled over by a Wayne State police officer and then arrested for a 22-year-old warrant.  He was taken to the Wayne County Baird Detention Facility.

Defendant Wellpath, LLC ("Wellpath") performed health care services for Wayne County, and performed an Intake Screening upon his arrival. (Wellpath Records are attached to Defendants Wellpath, LLC and Latanya Meadows, R.N.'s Motion to Preclude Plaintiff from Eliciting Expert Testimony from Plaintiff's Expert, Ralf Salke, R.N., as Exhibit A).  Mr. Powers had a visible dialysis port protruding from his chest, and the jail was further informed by his daughter of his health conditions and dialysis requirements.  (**Exhibit 1 - Deposition of Ronyetta Powers, pp. 19-20**).

Numerous issues with Wellpath's services are expressly set forth in the report prepared by Nurse Ralf J. Salke.  (**Exhibit 2 – Declaration of Ralf J. Salke, R.N., report attached as Exhibit A to the Declaration**).  Of note, screening incorrectly indicates that he was not taking medications despite his discussion of his health issues, vitals were not captured correctly and set forth significant risks otherwise, and despite his presentation, he was placed into

general population.  Mr. Powers' COWS score was not taken, and no dialysis was provided at all on December 11, 2017, as Wellpath permitted him to sign a release.

It is undisputed that up until the evening of December 11, 2017, Ronald Powers had been a "model inmate," with no behavioral issues.  (See **Exhibit 3 – Wayne County Internal Investigation Report, e.g. Interview of Defendant Davis**).  That evening, Mr. Powers, who had been a quiet person, became agitated following a court hearing earlier that day because he thought he would be released, and was now expressing his desire to go home and arguing for several hours to be released.  Later that night, at approximately 2:30 a.m., Mr. Powers began displaying erratic behavior. (Id.)

Corporal Steven Hunter confirmed earlier reports after taking over the Infirmary shift from Carey and Davis, that Mr. Powers was tampering with the television, and pacing and standing over other inmates in the ward invading their personal space.  He also took the padding from the wheelchair of another inmate, and was keeping the other inmates awake by talking to himself.  Ronald Powers was under duress for the entire night, and stated that he was convinced that one of the officers was going to shoot him. A witness described Mr. Powers 'behavior as [he] "seemed out of his mind."  This was all behavior that Hunter had never seen from Mr. Powers.  (See Id., Interview

of Corporal Hunter; and Corporal Hunter's Deposition is attached as Exhibit D to Defendants' Motion, pp. 91-92).

At 2:45 a.m., Defendant LaTanya Meadows, RN, an employee of Defendant Wellpath LLC, after being advised by Corporal Hunter of Mr. Powers' erratic behavior, essentially merely checked his blood glucose level, and allegedly the reading was normal.  Mr. Powers, without further assessment or referral by Nurse Meadows, was determined to be "fine." Corporal Hunter confirmed that he relayed all of the behavior by Mr. Powers, including the TV incident, the wheelchair incident, the hovering over the beds of other inmates, and the pacing.  (Hunter's Deposition, at pp. 46-47).

After additional episodes of erratic behavior, without requesting another examination by medical and apparently with Defendant Lucas's approval, Hunter moved Mr. Powers from Infirmary room #4 to medical holding cell #1, a cell that was not visible from the nursing station and with no video monitoring.

At 3:00 a.m., Officer Maddox conducted a security round, and observed Mr. Powers in the rear medical holding cell, standing at the bars of the cell and mumbling to himself.  (Exhibit 3, Defendant Maddox Interview).  Nurse Meadows, made aware now of Mr. Powers' erratic behavior by two officers, again failed to advise her supervisor Nurse Sherrod of his erratic behavior,

and failed to perform a nursing assessment to determine the cause of this erratic behavior.  Maddox also took no further action.

Nurse Salke, will testify that Defendant Meadows' "examination" and failure to follow-up with a doctor or supervisor were inadequate, as well as her record keeping.  (See report attached to Exhibit 2).  Further, while she testified that she obtained a blood sugar lab value, she did not document it on the log until 24 days after his death.  This extremely late entry also indicated that Mr. Powers was "alert and oriented x3," despite the reports from Corporal Hunter as it concerned his behavior.  On January 5, 2018, twenty-four (24) days after the death of Ronald Powers, Meadows added a late entry note for December 12, 2017, which indicated that she was notified by an officer regarding a request for a blood sugar assessment of a patient.  She writes that the blood sugar reading at that time was 93 mg/dl, that Mr. Powers appeared to be Alert and Oriented times 3, had no signs or symptoms of hypo/hyperglycemic reaction, and that Mr. Powers denied pain at the time. (See Exhibit A to Defendants' motion, ECF No. 77-2, PageID.1257).  Nurse Salke further highlights that she allowed Mr. Powers to a medical holding cell that did not provide for constant/consistent monitoring.  (See report attached to Exhibit 2).

At 4:00 a.m., during a security round, Mr. Powers was discovered lying on the floor of his cell on his back with blood pooling around his head area, unresponsive. On-duty nurses in the infirmary from Wellpath LLC were alerted by the rounding officer that Mr. Powers required medical assistance in holding cell #1. Vital signs were assessed, and continuous CPR started. While giving chest compressions blood was streaming from his dialysis port, until Nurse Clark returned with a clamp.

EMS arrived at 4:16 a.m., and departed the scene for Detroit Receiving Hospital; however, further resuscitative efforts were futile, and Ronald Powers was pronounced dead at 4:50 a.m. (**Exhibit 4 – Records from Wayne County Medical Examiner's Office**). The Wayne County Medical Examiner Report indicates "that death was caused by exsanguination as a consequence of a severed hemodialysis catheter in right upper chest due to end-stage renal disease." It continues: "A laceration with associated abrasion was on the back of the head and is consistent with an injury sustained during a terminal fall. It is unknown if the port was severed from catching on something within the holding cell or by the decedent himself, or if he understood the consequence (sic) such behavior."[1]

---

[1] Plaintiff will provide a detailed statement of facts within his Response in Opposition to Defendants' Motions for Summary Judgment, and incorporates those counter-statements of facts herein, in their entirety.

Plaintiff claims against Wellpath LLC in its own capacity allege deliberate indifference, negligence, and gross negligence for failing to provide proper medical care to Mr. Powers, and failing to properly supervise and train its staff.  Plaintiff further alleges deliberate indifference, medical malpractice, negligence, and gross negligence against Nurse Meadows for her conduct, for which Wellpath is also (vicariously) liable.

However, the individually named Defendant officers observed the erratic behavior and deteriorating state of Mr. Powers on December 11, 2017, and were aware of his serious health conditions and exposed dialysis ports. Nevertheless, they failed to ensure appropriate assistance, and moved him to an isolated cell, unmonitored.  Plaintiff, therefore, alleges deliberate indifference against Wayne County and the individually named officers, as the County failed to properly train officers and jail personnel or have policies in place as to the evaluation of whether a detainee requires medical treatment, failed to provide timely medical attention, and failed to appropriately monitor a detainee such as Mr. Powers.  The conduct of these officers further constitutes gross negligence.

Dr. Westrick expressly faults the Wayne County Defendants for not petitioning for his release based upon his medical conditions.  He should not have been held through the weekend, especially on the charges at issue.  He

should have been seen by medical/nursing staff when his behavior continued following the ruling out of blood sugar issues, he should not have been transferred to what amounted to an isolation cell without any monitoring as required by American Corrections Association Core Jail Standards and Policy, and should not have been left unobserved for over an hour, when standards require observation at least every 30 minutes on an irregular schedule.  (See **Exhibit 5 – Declaration of Dr. Aaron Westrick: Report attached as Exhibit A; and Exhibit 6 – Dr. Westrick's CV**).

As noted, Nurse Salke prepared a report in this case, and he was also deposed. (CV attached as **Exhibit 7**, and Deposition as **Exhibit 8**).  Nurse Salke will provide relevant expert testimony that will assist the jury, and such an injustice should not be permitted.  Defendants seek to have Nurse Salke's testimony precluded in this case, despite expressly acknowledging his extensive qualifications to testify in this case based upon his education and again, unique and extensive work experience in corrections healthcare. Because Nurse Salke has the specialized knowledge necessary to offer his opinions in this case that will greatly assist the trier of fact, his testimony must not be precluded.

Nurse Salke's experience is vast. He has over 35 years of health care experience, which includes 32 years of correctional health care experience.

He is a policies and procedures expert, assisting in the development of policies and procedures that comply with regulatory bodies, as well as assisting with staffing and orientation programs, and monitoring existing programs **in the correctional environment**.  A review of his CV, report, and deposition testimony make clear that he is eminently qualified to testify as to all of the Defendants' breaches in this case, as he is qualified to discuss the relationship and responsibilities of the medical staff, especially nurses, in conjunction with those of the jail staff.

More than fifty percent of his time is dealing with nursing issues and nursing concerns, physically onsite or directly involved, reviewing records, attending meetings, and developing plans and corrective actions.  (Exhibit 8, pp. 38).  His activities have required that he assist in hands-on treatment when needed, while overseeing roughly 600 nurses at 21 facilities in Missouri, all in the setting of corrections.  (Id. at pp. 40-41).

His opinions are based on his education and experience, his review of case documents, and his report specifically cites case documents with page citations, as well as authoritative articles (See Exhibit A to Declaration).  This Court can instruct if necessary so that Nurse Salke refrains from making legal conclusions.  However, his knowledge and experience allow him to explain

to a jury what the pertinent industry standards are and whether these Defendants violated such standards.

Nurse Salke, as demonstrated by his CV, report, and deposition testimony, is well-qualified to opine in this case as to the Wayne County Defendants.  However, should the Court believe that further inquiry into his opinions in this case is necessary, a *Daubert* hearing is the appropriate remedy.  Preclusion of his testimony in its entirety based upon these motion papers is not warranted.

Similarly, Defendants seek to have Dr. Westrick's testimony precluded in this case, by ignoring Dr. Westrick's unique qualifications to testify in this case based upon his education and experience, and relying upon case law, specifically, *Berry v. City of Detroit,* 25 F.3d 1342 (6th Cir. 1994), easily distinguishable factually.  Indeed, *Berry* is distinguishable for the very same reasons the Sixth Circuit refused to follow that decision in *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893 (6th Cir. 2004).  Just as the expert in *Champion*, Dr. Westrick has the credentials and expertise about police activities, policies and procedures.  Because Dr. Westrick has the specialized knowledge necessary to offer his opinions in this case, his testimony must not be precluded.

Dr. Westrick's experience is vast. (**Exhibit 5 – Declaration of Dr. Aaron Westrick: Report attached as Exhibit A; and Exhibit 6 – Dr. Westrick's CV**). Dr. Westrick has served as a professor, research director, consultant speaker (seminars and lectures), law enforcement officer, and is an expert in criminal justice as to tactics/use-of-force, ballistics, as well as social justice policy issues. He has received numerous awards, honors, and research grants. He is a member of numerous organizations and has published numerous articles regarding police action, including a book entitled Use of Force Investigations, Second Edition, published in 2018. In addition to being an Associate Professor at Lake Superior State University, Dr. Westrick has taught at numerous universities and organizations, including the International Association of Chiefs of Police, and as a consultant with both the government and private companies. (See Exhibit 5, Dr. Westrick's Report). He is a Michigan Department of Corrections instructor, certified since 1987. (Id).

Certainly, his opinions in this case are based on his education and experience. However, they are also based upon industry texts and conference materials, such as American Corrections Association: Core Jail Standards First Edition (2010); Michigan Criminal Law and Procedure (2017); Michigan Sheriffs' Education Fund (1982), Michigan Law Enforcement Manual, Section: Corrections Law and Procedure (Michigan Department of Correction

Rules); and his own publication, Use of Force Investigation, Second Edition (2018). Citations to these authorities are noted in his report. (Id).

Dr. Westrick is qualified to testify as to the accepted police policy and best practices concerning the failures of the Wayne County Defendants in this case. Such testimony would not constitute legal conclusions. His knowledge and experience allow him to explain those industry standards to a jury. And whether these Defendants violated such standards is certainly relevant testimony, and do not constitute legal conclusions as to "deliberate indifference" and/or "gross negligence." There is no need to exclude his testimony in its entirety; however, the Court can limit the scope/extent of his testimony if deemed appropriate.

Dr. Westrick, as demonstrated by his CV and report, is qualified to discuss police policies and procedures, including those in the corrections setting. Defendants' motion should be denied. However, should the Court believe that further inquiry into his opinions in this case is necessary, a *Daubert* hearing is the appropriate remedy. Preclusion of his testimony in its entirety based upon these motion papers is not warranted.

## II.   Nurse Salke's and Dr. Westrick's Opinions are Reliable and Admissible under Fed. R. Evid. 702.  Defendants' Motion to Exclude their Testimony Should be Denied.

Fed. R. Evid. 702 provides that an expert may testify if he has specialized knowledge and is qualified based on "knowledge, skill, experience, training, or education" and his testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." There is no question that Nurse Salke meets the qualifications and standards of Fed. R. Civ. P. 702.  Nurse Salke certainly has the knowledge, skill, experience, training, and education, as demonstrated above, to proffer testimony on this matter.  As further demonstrated above, his qualifications, indeed, make him uniquely qualified for a correctional healthcare case.  Plaintiff further incorporates his brief in response to the Wellpath Defendants' motion to preclude Dr. Salke's testimony as if fully set forth herein.

Similarly, as demonstrated above, Dr. Westrick is qualified to testify in this case as to the violations of police policy and practice by the County and its Officers in this case.

Trial courts are charged with the function of acting as "gatekeepers" to ensure that all scientific testimony admitted is not only relevant, but reliable. See *Kumho Tire Co v Carmichael*, 526 U.S. 137 (1999); and *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579, 590 (1993).  When

considering a motion to preclude expert testimony, Fed. R. Civ. P. 702 provides that a trial judge must first determine, pursuant to Fed. R. Civ. P. 104(a), "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist a trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. Specifically, Fed. R. Evid. 702 governs the admissibility of expert testimony. That rule provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert,* the United States Supreme Court abandoned the well-established "general acceptance" threshold for scientific testing originally set forth in *Frye v. United States*, 293 F. 1013 (DC Cir 1923)[2] and specifically defined the trial court's special role as a "gatekeeper" with regard to expert

---

[2] According to the Supreme Court, the *Frye* test had been supplanted by adoption of the Federal Rules of Evidence, particularly Fed. R. Evid. 702. *Daubert*, *supra,* 509 US at 586-589.

opinion testimony and evidence, writing:

> The trial judge must ensure that any and all scientific testimony
> or evidence admitted is not only relevant, <u>but reliable</u>. [*Daubert*,
> 509 US at 589 (emphasis added).]

The Court further established the following non-exclusive, four-part

test to be used in determining whether the proposed expert testimony or

evidence is reliable:

(1)   Can the underlying scientific theory or technique be
       tested;

(2)   Has the theory or technique been subjected to peer
       review and publication;

(3)   Is there a known or potential rate of error for the
       particular scientific technique; and

(4)   Whether the underlying scientific technique has achieved
       a particular degree of acceptance within the relevant
       scientific community. [*Id*. at 592-594.]

**In some cases, "the relevant reliability concerns may focus upon**

**personal knowledge or experience. . . .There are many different kinds of**

**experts, and different kinds of expertise."** *Kumho*, 526 U.S. at 149

(emphasis added).  Daubert attempts to strike a balance between a liberal

admissibility standard for relevant evidence on the one hand and the need to

exclude misleading 'junk science' on the other. *United States v. LaVictor*, 848

F.3d 428, 441(6th Cir. 2017).

The list of factors is not exhaustive; nor is any one factor dispositive.

The district courts have 'considerable leeway' in determining whether expert testimony is admissible. See e.g. *Kumho*, 526 U.S. at 152). The court is not required to apply the *Daubert* factors unless they are helpful. See *Kumho, supra* at 151. **Application of some or all the Daubert factors is inappropriate where the proposed expert is offering expert testimony based on his or her specialized knowledge gained through experience, training or education**. See *United States v. Winkle*, 477 F.3d 407, 416 (6th Cir. 2007) (emphasis added). Such is appropriate here.

Additionally, in the Sixth Circuit, "Rejection of expert testimony is the exception, rather than the rule[.]" *In re Scrap Metal*, 527 F.3d 517, 530 (6th Cir. 2008). "The relevancy bar is low, demanding only that the evidence logically advances a material aspect of the proposing party's case." *LaVictor, supra* at 442. "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact. When there is a factual issue in dispute that expert testimony can clarify, there are limited grounds for rejecting the testimony of the expert witness." *Id.*

Thus, it is well recognized that the district court operates with wide latitude in deciding how to test an expert's reliability, and, as such, must be afforded considerable leeway in deciding how to go about determining whether particular expert testimony is reliable. *Id.*

There is no question that Dr. Westrick meets the qualifications and standards of Fed. R. Civ. P. 702.  Criminal Justice is a specialized body of knowledge and Dr. Westrick certainly has the knowledge, skill, experience, training, and education, as demonstrated above, to proffer testimony on this matter.

There is nothing objectionable as it concerns Dr. Westrick and his opinions.  His report and CV extensively set forth his knowledge of and experience in police policies and procedures, as well as the sources/principles that form the basis of his opinions.  He has gained that knowledge through his education, his work as a professor and lecturer, and his work as an officer.  He further cites authorities that he has read and/or relies upon in that capacity.  He is certainly qualified to explain to a jury where these Defendants failed as it concerns industry standards, policies, and practices; these are not legal conclusions.  His proffered testimony is relevant and will greatly assist the trier of fact.   Dr. Westrick has not prepared a report that states legal conclusions; he extensively sets forth his knowledge and experience, as well as the sources/principles that form the basis of his opinions.

Defendants' reliance upon *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994), is telling.  That case is easily distinguishable here, for the precise reasons it was distinguished by the Sixth Circuit in *Champion v. Outlook*

*Nashville, Inc.,* 380 F.3d 893 (6th Cir. 2004).

Indeed, the chief reason for our decision in *Berry* was that the expert's credentials demonstrated that he had no specific expertise about police activities. He had limited experience, given that he was appointed as a deputy sheriff, a post that required almost no qualifications, and he had been fired twice from the position. Furthermore, he lacked any formal training or experience on the subject of criminology or police actions . . .

. . . By contrast, the Plaintiffs' expert, Alpert, testified about a discrete aspect of police practices, namely use of excessive force, based upon his particularized knowledge about the area. In contrast to the expert in *Berry,* Alpert's credentials are much more extensive and substantial. Alpert has a PhD in sociology from Washington State University, is employed by the University of South Carolina's Department of Criminology, teaches classes on police procedures and practices, has been involved with federal research funded by the Department of Justice that evaluates the use of force by officers, trains officers in the use of force, works with police departments to create use-of-force policies, has testified before Congress and state legislatures about police policies, and has authored forty to fifty articles on the subject of police procedures, many of which have appeared in peer-reviewed journals. Alpert Test., Transcript Vol III at 428–32 (Attached to Motion to Take Judicial Notice). Unlike the expert in *Berry,* Alpert testified about much more specific issues: the continuum of force employed by officers generally, the specific training the Officers received, and Alpert's opinion that if the witnesses' testimony is credited, the Officers' actions violated nationally recognized police standards governing excessive force. The critical difference between testifying about the impact of police policies upon a

large group of officers and testifying about the proper actions of individual officers in one discrete situation highlights the inapplicability of *Berry.* Courts have permitted experts to testify about discrete police-practice issues when those experts are properly credentialed and their testimony assists the trier of fact. *See Dickerson,* 101 F.3d at 1163–64; *Kladis v. Brezek,* 823 F.2d 1014, 1019 (7th Cir.1987). Because Alpert had considerable experience in the field of criminology and because he was testifying concerning a discrete area of police practices about which he had specialized knowledge, we hold that the district court did not abuse its considerable discretion in admitting Alpert's testimony.

*Champion, supra,* at 908–09 (6th Cir. 2004).

Dr. Westrick's credentials almost identically track those credentials of Alpert.   He is similarly qualified to testify as to police practices and procedures, also has a PhD in sociology, is also employed by a university as a professor, also teaches classes on procedures and practices, is also involved in governmental and private industry research, has also testified before governmental bodies about police policies, has also authored numerous articles, as well as a book, and has also presented as a lecturer at numerous seminars.

Just as Alpert was properly credentialed and had specialized knowledge, and the Sixth Court reasoned his testimony assisted the trier of

fact, this Court should do the same.  This Court should deny the Wayne County Defendants' motion.

## III.   **Conclusion.**

WHEREFORE, Plaintiff respectfully requests that this Honorable Court DENY the Wayne County Defendants' Motion to Preclude Testimony from Dr. Aaron Westrick and Ralf Salke.

Alternatively, should the Court believe further inquiry is necessary, a *Daubert* hearing is the appropriate remedy.

Respectfully submitted,

**Fieger, Fieger, Kenney & Harrington, P.C.**

*/s/ David A. Dworetsky*
GEOFFREY N. FIEGER (P30441)
DAVID A. DWORETSKY (P67026)
Attorneys for Plaintiff
19390 W. 10 Mile Rd.
Southfield, MI 48075
(248) 355-5555

Dated:  March 24, 2022

## <u>CERTIFICATION OF LOCAL RULE 5.1(a) COMPLIANCE</u>

I, David A. Dworetsky, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

*/s/David A. Dworetsky*
DAVID A. DWORETSKY (P67026)
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, Michigan 48075
(248) 355-5555

CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/David C. Savageau*
David C. Savageau