UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD GAINES,

    Plaintiff,

vs.

COUNTY OF WAYNE, et al.,

    Defendants.
_____/

Case No. 20-11186

HON. MARK A. GOLDSMITH

**OPINION AND ORDER (1) GRANTING THE WELLPATH DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE FEDERAL CLAIMS AGAINST THEM (Dkt. 84); (2) GRANTING THE WAYNE COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE FEDERAL CLAIMS AGAINST THEM (Dkt. 85); AND (3) DISMISSING THE REMAINING STATE-LAW CLAIMS WITHOUT PREJUDICE**

This matter is before the Court on the Wellpath Defendants' motion for summary judgment (Dkt. 84) and the Wayne County Defendants' motion for summary judgment (Dkt. 85).[1] The Court grants the Wellpath Defendants' motion for summary judgment as to the federal claims against them because Plaintiff Ronald Gaines lacks the requisite medical evidence to demonstrate that these Defendants were deliberately indifferent to his decedent's medical needs. The Court grants the Wayne County Defendants' motion for summary judgment as to the federal claims against them because Gaines has failed to create a triable issue as to whether his decedent was experiencing a serious medical need, and because Gaines has failed to provide evidence that the individual Wayne County Defendants knew that their failure to respond would create a serious risk to

---

[1] The Wellpath Defendants are Wellpath LLC, a private provider of healthcare services for the Wayne County Jail, and Latanya Meadows, a Wellpath nurse. Am. Compl. ¶¶ 15, 17, 19 (Dkt. 14). The Wayne County Defendants are Wayne County; Sgt. Leonard Davis and Sgt. Steven Hunter, both employed by the County; Michael Gatson, a jail infirmary sergeant; Jeremy Lucas, a sergeant at the jail; and Shanique Maddox, a police officer at the jail. Id. ¶¶ 8–13.

decedent and ignored that risk. The Court dismisses without prejudice the remaining state-law claims.[2]

## I. BACKGROUND

Gaines alleges that nurses, correctional officers, and other personnel failed to properly observe and care for his father, Ronald Powers, who had health conditions including end-stage renal disease requiring hemodialysis and methadone for pain treatment, while Powers was incarcerated at the Wayne County Jail. Gaines asserts that Powers's death while in custody resulted from Defendants' deficient conduct. The facts relevant to the summary judgment analysis are set forth below.

**A. Initial Period of Powers's Detention**

Powers, a 67-year-old man, was arrested on a 22-year-old warrant on December 8, 2017 and booked into the Wayne County Baird Detention Facility. Powers reported to Wellpath staff that he was diabetic, diagnosed with cancer, and undergoing hemodialysis three days per week, and the presence of his dialysis catheter was noted. See Wellpath Progress Notes at PageID.2527–2532 (Dkt. 84-2). Powers did not indicate that he was experiencing opiate withdrawal, but he did report taking methadone as recently as the day before, so the opiate withdrawal protocol (COWS protocol) was initiated. See id. at PageID.2529.

---

[2] Because oral argument will not aid the Court's decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the Wellpath Defendants' motion, the briefing includes Gaines's response (Dkt. 91), the Wellpath Defendants' reply (Dkt. 101), a supplemental brief filed by Gaines (Dkt. 118), and a supplemental brief filed by the Wellpath Defendants (Dkt. 119). In addition to the Wayne County Defendants' motion, the briefing includes Gaines's response (Dkt. 92) and the Wayne County Defendants' reply (Dkt. 100).

At various points from December 8, 2022, to December 11, 2022, Powers had his vital signs, blood sugar, blood pressure, and withdrawal symptoms monitored, and he received medications to help with withdrawal symptoms. See id. at PageID.2527 (indicating that Powers's blood pressure, heart rate, respiratory rate, and pulse oximetry were assessed on Dec. 8, 2017); id. at PageID.2531 (same); id. at PageID.2524 (indicating that Powers's blood pressure and heart rate were assessed on Dec. 9, 2017); COWS Score Sheet at PageID.2578 (Dkt. 84-2) (indicating that Powers's blood pressure, resting pulse, temperature, respiration, and withdrawal symptoms were assessed on Dec. 10 and Dec. 11, 2017); Medication Administration Record at PageID.2511 (Dkt. 84-2) (documenting administration of various medications). It is unclear whether Powers received dialysis treatment while incarcerated. See Wellpath Mot. at PageID.2451 (asserting that Powers received two hours of dialysis on Dec. 9, 2017) (citing Wellpath Progress Notes at PageID.2524[3]); Gaines Resp. to Wellpath Mot. at PageID.4010 (stating that "Wellpath did not provide dialysis treatment").

Powers had a court proceeding on December 11, 2017. When he returned to the jail at 4:00 p.m., he refused dialysis treatment, see Chardonnay Dialysis, Inc. Records at PageID.2550 (Dkt. 84-2), because he anticipated being released that night, and he planned to attend his usual dialysis center the next day.

**B. Continued Incarceration on December 11, 2017**

The facts surrounding Powers's behavior the night of his death are largely undisputed. Corporal Leonard Davis, who was on duty at Wayne County Jail that evening, testified that Powers

---

[3] This page of the Wellpath Progress Notes has a note from Registered Nurse Boone stating, "S/O Inmate post Cateress B/P 226/86 . . . ." See also Wellpath Progress Notes at PageID.2526 (containing a note from Boone stating, "S/O Informed by dialysis nurse inmate B/P25//100 DRN contacted the nephrology on call who ordered Cateress 0.2 x 1 now . . . .").

3

became frustrated that he was not released from the jail following the court hearing on December 11, 2017.[4] Davis Dep. at PageID.3154 (Dkt. 85).[5] Davis and Davis's supervisor, Sergeant Berry, spoke with Powers and advised that he would not be released until he was cleared by the court. Id.

Security rounds were conducted at 7:18 p.m., 8:16 p.m., 9:14 p.m., and 10:01 p.m. that night. Officer Activity Log at PageID.3188 (Dkt. 85). During his rounds, Davis spoke with Powers, who said he was "ready to go home" and didn't "want to be [at the jail]." Davis Dep. at PageID.3155. Powers also called Davis to his cell several times to express that he was frustrated and wanted to go home. Id. at PageID.3155–3156.

Nothing about Powers's behavior at this time caused Davis concern. Id. at PageID.3156. Powers did not tell Davis that he had any medical conditions or needs, and Davis did not observe behavior indicating signs of substance withdrawal. Id. at PageID.3159. Powers never indicated to Davis an intent to self-harm, and Davis did not observe any signs that he would do so. Id. at PageID.3162.

**C. Powers's Erratic Behavior**

Around 11:00 p.m., Davis's shift ended, and he was replaced by Corporal Steven Hunter. Wayne Mot. at PageID.3040; Gaines Resp. to Wayne Mot. at PageID.4660. Hunter was assigned to the infirmary overnight between December 11, 2017 and December 12, 2017. See Hunter Dep. at PageID.3077 (Dkt. 85). At approximately 11:15 p.m., on his first security round, Hunter

---

[4] Davis is referred to as a sergeant in the Amended Complaint but is referred to as a corporal in both Wayne County's motion for summary judgment and Gaines's response to that motion.

[5] The Wayne County Defendants combined all of their exhibits into the same filing as their motion and supporting brief, including the deposition transcripts and security logs cited in this order and opinion.

observed Powers standing in his cell. Id. at PageID.3077–3078; Officer Activity Log at PageID.3188.

Over the next several hours, Powers's roommates called Hunter to their cell in the infirmary at least four times because of Powers's behavior. Hunter Dep. at PageID.3078–3079. Powers's roommates told Hunter that Powers was "tearing up [a] wheelchair," "trying to pull the [television] off the wall," "talking to himself," and "hovering over [their] beds." Id. Hunter did not see any of Powers's strange behavior himself. Id. at PageID.3079. When called to the cell, he would tell Powers to stop the behavior, and then 30–45 minutes later he would be called back to the cell again because of ongoing issues. Id. at PageID.3078. Hunter had never seen this behavior from Powers before, whom he described as generally displaying model behavior. Gaines Resp. to Wellpath Mot. at PageID.4015; Wellpath Reply at PageID.5248.

At approximately 2:30 a.m. on December 12, 2017, Hunter called medical personnel to advise that Powers was behaving erratically and requesting that someone evaluate him in case there was anything wrong. Hunter Dep. at PageID.3078–3080; Wayne Mot. at PageID.3041–3042; Gaines Resp. to Wayne Mot. at PageID.4661. Nurse Latanya Meadows arrived to assess Powers at approximately 2:46 a.m. Wayne Mot. at PageID.3042; Gaines Resp. at PageID.4661.

**D. Extent of Meadows's Knowledge**

The parties disagree as to how much of Powers's behavior Hunter described to Meadows. According to the Wellpath Defendants, Hunter indicated when he called the nursing staff that Powers was acting "weird." Wellpath Mot. at PageID.2453 (citing Latanya Miller-Meadows Dep.

5

at PageID.2749 (Dkt. 84-4)[6] (stating, "[Powers] was in the infirmary, and we were called by the guard saying that he just was acting weird, is pretty much what he said . . .)).

Gaines, on the other hand, asserts that "Corporal Hunter provided the details of [Powers's] behavior to Defendant Meadows, not just that he was acting 'weird.'" Gaines Resp. to Wellpath Mot. at PageID.4011 (citing Hunter Dep. at PageID.4184–4186 (Dkt. 91-3)). This portion of Hunter's deposition transcript indicates that Hunter described Powers's erratic behavior in detail to the nurse who picked up his call. These specific facts included "the TV incident, the wheelchair incident, and him hovering over the other guys' beds as they were trying to sleep," as well as the fact that Powers was "pacing all night," "wouldn't stay still," and "was all over the place in that room that night." Hunter Dep. at PageID.4185–4186. However, Hunter testified that while Nurse Meadows eventually responded, he could not recollect which nurse picked up this call. Id. at PageID.4184. The Wellpath Defendants argue that there is nothing in the record to support Gaines's claim that Meadows received specific information about Powers's behavior from Hunter. Wellpath Reply at PageID.5248 (citing Hunter Dep. at PageID.4183).

**E. Extent of Meadows's Medical Assessment**

When Meadows arrived at the infirmary, Powers was sitting quietly on his bed. Wellpath Mot. at PageID.2453; Gaines Resp. to Wellpath Mot. at PageID.4011–4012. Meadows checked Powers's blood sugar, asked about how he was feeling and whether he was in pain, and ultimately

---

[6] The Wellpath Defendants actually cite to their Exhibit E at 39:9–16, but Exhibit E is Kimberly Pearson's Expert Disclosures, and there is no page 39. The Court assumes that the Wellpath Defendants intended to cite to their Exhibit C, which is Latanya Miller's (formerly Latanya Meadows) deposition transcript.

This portion of her deposition includes testimony that on the night in question, "we were called by the guard saying that [Powers] just was acting weird . . . ." Miller-Meadows Dep. at PageID.2749 (Dkt. 84-4).

6

found him to be alert and oriented with no signs of hyperglycemia or hypoglycemia and not experiencing pain. Wellpath Mot. at PageID.2453 (citing Diabetic Finger Stick Record at PageID.2581 (Dkt. 84-2); Miller-Meadows Dep. at PageID.2749, 2751[7]). The blood sugar reading was 93 mg/dl. Wellpath Mot. at PageID.2453; Gaines Resp. to Wellpath Mot. at PageID.4011–4012. Meadows entered a "late entry" note in Gaines's Wellpath Progress Notes on January 5, 2018, 24 days after Powers's death, documenting this assessment and blood sugar reading. Wellpath Progress Notes at PageID.2522.

Gaines and the Wellpath Defendants disagree about whether Meadows assessed Powers's vital signs during her Dec. 12, 2017 assessment. The Wellpath Defendants assert that Meadows "obtained a set of vital signs which were within normal parameters," Wellpath Mot. at PageID.2453 (citing Miller-Meadows Dep. at PageID.2749, 2751[8]), but Gaines argues that Meadows did not check Powers's vitals. Gaines Resp. to Wellpath Mot. at PageID.4012 (citing Progress Notes at PageID.4078 (Dkt. 91-2) (showing Meadows's Jan. 5, 2018 late entry note on a form with a section for "Patient Vitals," including typed text reading "Observed Date," "Blood Pressure," "Pulse," "Resp. Rate [respiration rate]," "Temp. [temperature]," "Pulse Ox. [pulse oximetry]," "Weight," and "BMI [body mass index]," with no measurements listed for any of these categories, and including a check box for "Vital Signs Taken" that is not checked)).

---

[7] The Wellpath Defendants again actually cite Exhibit E, but the Court assumes from context that they intend to cite to Meadows's deposition transcript. This portion of her deposition includes testimony that on the night in question, Meadows "did an assessment on [Powers], took some vitals, took a blood sugar, asked him how he was feeling. He said he was feeling okay. I asked him if he was in pain. He said he had no pain, and everything was within normal limits." Miller-Meadows Dep. at PageID.2749. This portion of the deposition also includes Meadows's testimony that the officer who called the nurses said "[j]ust [that] [Powers] was acting weird." Id. at PageID.2751.

[8] The Wellpath Defendants again actually cite Exhibit E, but the Court assumes from context that they intend to cite to Meadows's deposition transcript.

7

**F. Movement of Powers to a Medical Holding Cell**

After her assessment of Powers, Meadows indicated to Hunter that Powers was "fine." Hunter Dep. at PageID.4191–4192. As a result of his own observations, what he was told by Davis, and this assessment by Meadows, Hunter believed Powers was having a behavioral issue. Id. at PageID.4192–4193.

Eventually, Hunter came to believe that Powers needed to be moved out of the infirmary cell because another incarcerated person was threatening to "pummel" Powers. Hunter Dep. at PageID.4193. According to the Wayne County Defendants, Hunter called Sergeant Michael Gatson, the registry sergeant, to notify him that he was going to place an incarcerated person in the medical holding cell once that person was cleared by the nurse, and Powers was moved there at 2:57 a.m. Wayne Mot. at PageID.3043–3044 (citing Gatson Dep., at PageID.3099 (Dkt. 85); Inmate Activity Log at PageID.3065 (Dkt. 85)). Gaines asserts that Hunter called and spoke with Defendant Jeremy Lucas, and that Gatson then called Hunter back. Gaines Resp. to Wayne Mot. at PageID.4662 (citing Hunter Dep. at PageID.4933–4935 (Dkt. 92-5)). Hunter told Lucas and Gatson "everything that was going on." Id. (citing Hunter Dep. at PageID.4934).

**G. Observation of Powers After Move to Medical Holding Cell**

Officer Shanique Maddox conducted a floor security round at 3:05 a.m., and all seemed secure. Wayne Mot. at PageID.3044 (citing Officer Activity Log at PageID.3189); Gaines Resp. to Wayne Mot. at PageID.4662. Before the round was conducted, Maddox was aware that Powers had been moved to the medical holding cell "to avoid . . . confrontation or a fight occurring." Maddox Dep. at PageID.3172 (Dkt. 85). The Wayne County Defendants assert that Maddox also saw Hunter advise medical personnel that Powers had been moved to the medical holding cell.

8

Wayne Mot. at PageID.3044 (citing Maddox Dep. at PageID.3172–3173 (stating that Maddox observed Hunter advise the nursing staff that Powers had been moved to the holding cell)).

During Maddox's rounds, Powers was standing at the front of the medical holding cell; he was awake, alert, and possibly mumbling, but "didn't appear to give any type of indication . . . [that he was] in any kind of trouble." Maddox Dep. at PageID.3176.

Before Hunter entered an incident report about Powers into the jail management system, he returned to the medical holding cell to check the cell number and observed Powers standing in the bars and staring at him. Hunter Dep. at PageID.3084. The incident report was entered at approximately 3:30 a.m. See Incident Report 2017-00016010 at PageID.3192 (Dkt. 85).

**H. Powers's Death**

At 4:00 a.m., Officer Rudolph Carey found Powers in his cell lying on his back with blood pooling around his head. See Wayne Cnty. I.A. Investigation at PageID.3195–3196 (Dkt. 85). Emergency medical services (EMS) personnel took over medical care at 4:15 a.m., after which Powers was transported to Detroit Receiving Hospital, where he was pronounced dead at 4:50 a.m. See id. Powers died because of the intentional or unintentional removal of his dialysis port. See Wayne Cnty. Med. Examiner's Rep. at PageID.4360 (Dkt. 91-6).

## II. ANALYSIS[9]

Gaines brings claims against the Wellpath Defendants for deliberate indifference to Powers's medical needs under 42 U.S.C. § 1983 and the Fourteenth Amendment, as well as claims for medical malpractice and negligence. Gaines brings claims against the Wayne County Defendants for deliberate indifference to Powers's medical needs under 42 U.S.C. § 1983 and the Fourteenth Amendment, as well as a claim for gross negligence.

The Court first discusses the standard for Fourteenth Amendment deliberate indifference claims, and it then considers Powers's claims as to each Defendant.

### A. Deliberate Indifference to Medical Needs

Individuals in pretrial custody have a Fourteenth Amendment right to be free from deliberate indifference to their serious medical needs. Greene v. Crawford Cnty., Mich., 22 F.4th 593, 605 (6th Cir. 2022). The Sixth Circuit has articulated the test for medical indifference claims as follows:

> [A] plaintiff must satisfy three elements for an inadequate-medical-care claim under the Fourteenth Amendment: (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk.

---

[9] In assessing whether Defendants are entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

Trozzi v. Lake Cnty., Ohio, 29 F.4th 745, 757–758 (6th Cir. 2022).  To succeed on such a claim, a plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard."  Greene, 22 F.4th at 606 (punctuation modified).

A plaintiff can demonstrate a serious medical need "by showing that a doctor has diagnosed a condition as requiring treatment or that the prisoner has an obvious problem that any layperson would agree necessitates care."  Phillips v. Tangilag, 14 F.4th 524, 534 (6th Cir. 2021).  Medical evidence is generally not required "where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention."  Blackmore v. Kalamazoo Cnty., 390 F.3d 890, 898 (6th Cir. 2004); see also id. at 899 (holding that medical evidence requirement did not apply where incarcerated plaintiff, rather than "suffer[ing] from a long-term and well monitored illness," "exhibited obvious manifestations of pain and injury" including "sharp and severe stomach pains" and vomiting over an extended period of time); Burwell v. City of Lansing, 7 F.4th 456, 463–464 (6th Cir. 2021) (holding that need for medical care was "obvious" where incarcerated person was "in clear medical distress," and video showed him "bent at the waist, swaying and rocking on the bench inside his cell, grabbing his head and midsection, dropping his sandwich numerous times, and falling to the floor repeatedly" for "nearly 40 minutes," and where he later "collapsed," with an expanding pool of vomit around his head).

In certain circumstances, medical evidence is required. Specifically, where a plaintiff's medical indifference claim is premised either on (i) an "affliction [which] is seemingly minor or non-obvious," or (ii) inadequate medical care (rather than a total lack of medical care), medical evidence—generally in the form of expert testimony—is required.  Blackmore, 390 F.3d at 898; see also Phillips, 14 F.4th at 536 (rejecting Eighth Amendment deliberate indifference claim, where incarcerated plaintiff had received extensive care for his medical need, because he failed to

11

"present expert medical evidence describing what a competent doctor would have done and why the chosen course was not just incompetent but grossly so"); Rhinehart v. Scutt, 894 F.3d 721, 740–741 (6th Cir. 2018) (holding that plaintiffs "failed to introduce the requisite evidence for a jury to find" that prompt and regular specialist monitoring was necessary for an incarcerated individual with end-stage liver disease).

**i. Meadows**

The Wellpath Defendants argue that because Gaines's proposed expert witnesses have been precluded from testifying as experts, Gaines cannot succeed on a claim of medical indifference against them. Wellpath Supp. Brief at PageID.5372. Gaines, on the other hand, argues that a jury could, without any expert explanation, find that leaving Powers in a holding cell without constant monitoring was deliberate indifference to his medical needs. See Gaines Supp. Brief at PageID.5367.

Here, it is undisputed that Meadows—the only individually named Wellpath Defendant—did not herself witness any of Powers's erratic behavior on the night of his death, and that when she arrived at the infirmary he was sitting quietly on his bed. While Gaines and the Wellpath Defendants disagree about the extent of Meadows's knowledge regarding Powers's behavior prior to her assessment, Powers was not at any point demonstrating "obvious manifestations of pain and injury" like the "sharp and severe stomach pains" and vomiting experienced by the incarcerated person in Blackmore, 390 F.3d at 899. And Gaines does not attempt to compare Powers's symptoms to those detailed in Blackmore or similar cases. Nor does Gaines provide any authority holding that mumbling, standing over cellmates, and taking apart a wheelchair can demonstrate "an obvious need for medical care that laymen would readily discern as requiring prompt medical attention." Id. at 898.

12

The case Gaines cites for the proposition that expert testimony is not required for § 1983 medical indifference claims, Morgan v. D.C., 824 F.2d 1049 (D.C. Cir. 1987), featured a risk of harm that was obvious to laypeople and that did not occur in the medical context. In Morgan, the court affirmed the district court's denial of defendant's motion for judgment notwithstanding the verdict, holding that expert testimony on prison security was not required for a jury to assess whether sustained overcrowded conditions in a prison resulted in the assault of an incarcerated person by another incarcerated individual with a known history of violence. Id. at 1060–1062. Morgan is of little relevance to the present case, where the plaintiff attacks a medical provider's response to a patient showing no obvious signs that his health was in danger. Without expert medical testimony, Powers cannot succeed on a medical indifference claim based on a non-obvious medical need. Blackmore, 390 F.3d at 898.

Further, though Gaines attacks the adequacy of the care that Meadows administered, Gaines does not attempt to distinguish the present case from cases like Phillips, 14 F.4th at 536, which held that medical evidence was required to demonstrate why a chosen course of medical action was grossly incompetent, or Rhinehart, 894 F.3d at 740–741, which rejected a claim that regular monitoring was necessary for an incarcerated individual with end-stage liver disease where the requisite medical evidence was not provided.

In response to Hunter's call to medical personnel, Meadows assessed Powers and obtained a blood sugar reading of 93 mg/dl, which is within the "normal" range. Wellpath Mot. at PageID.2453; Pl. Resp. to Wellpath Mot. at PageID.4011–4012. Regardless of Meadows's knowledge of Powers's behavior, a jury cannot determine—without medical evidence—whether Meadows should have assessed measures other than blood sugar, whether she should have alerted a supervisor or physician, and whether she should have made sure Powers was subject to constant

13

observation. These are all technical matters for which medical evidence is required to demonstrate constitutionally deficient medical care. Phillips, 14 F.4th at 536; Rhinehart, 894 F.3d at 740–741.

Because Gaines cannot demonstrate that Powers was demonstrating "an obvious need for medical care that laymen would readily discern as requiring prompt medical attention," and because he has failed to provide medical evidence to support the existence of a serious medical need or to explain why Meadows's assessment was unconstitutionally inadequate, Gaines cannot succeed on a deliberate indifference claim against Meadows. Blackmore, 390 F.3d at 898; Phillips, 14 F.4th at 538.[10] Summary judgment is granted as to this claim.

**ii. Wellpath**

As an organization under contract to perform traditional functions of the state, Wellpath can be held liable for constitutional violations pursuant to Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978). See Street v. Corrs. Corp. of Am., 102 F.3d 810, 814 (6th Cir. 1996). To succeed on a Monell claim, Gaines must demonstrate that the deliberate indifference occurred because of a municipal policy or custom. See Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013). The Wellpath Defendants argue that Gaines has failed to produce any evidence of a policy or custom that led to the alleged constitutional violation. Wellpath Mot. at PageID.2474–2475. The Court agrees.

A plaintiff can demonstrate an illegal municipal policy or custom by proving: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final

---

[10] While Gaines states that summary judgment should be denied because "Defendants failed to provide Mr. Powers with his dialysis treatment, failed to follow the appropriate COWS protocol, and failed to provide him with methadone," which "c[ould] constitute a constitutional violation," he does not argue that Meadows herself was connected to any of these alleged failures. Gaines Resp. to Wellpath Mot. at PageID.4029 (citing Richmond v. Huq, 885 F.3d 928, 947 (6th Cir. 2018)); see also Gaines Supp. Brief at PageID.5365. As a result, such arguments have no bearing on the medical indifference claim against her.

decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." Burgess, 735 F.3d at 478.  Gaines grounds his claim against Wellpath on a failure to adequately train and supervise and on a supposed ratification of unconstitutional acts by an official with final decision-making authority, Gaines Resp. to Wellpath Mot. at PageID.4030, but these theories, as explained below, are inadequately developed or supported.

Gaines states that "the prevalence of violations, as set forth throughout this response, demonstrates at the very least a question of fact as to whether these failures were the result of inadequate training and/or supervision." Id. (citing Burgess, 735 F.3d at 478).  Gaines does not clearly articulate what specific facts he contends reflect the alleged "prevalence of violations." Gaines states that "a jury could reasonably determine that Defendant Meadows did not properly perform her assessment of Mr. Powers or timely enter her note because she was not properly trained or supervised," Gaines Supp. Brief at PageID.5365, but he does not describe the training Meadows did or did not receive.

The Wellpath Defendants correctly point out that to succeed on a failure to adequately train or supervise claim, Gaines must show either (i) a pattern of similar constitutional violations by untrained employees or (ii) that a constitutional violation against Powers was an obvious or very predictable result of inadequate training. Wellpath Reply at PageID.5252 (citing Bd. of the Cnty. Comm'rs v. Brown, 520 U.S. 397, 407–409 (1997)); see also Connick v, Thompson, 563 U.S. 51, 62–64 (2011).  Gaines has not provided facts that could create a triable issue as to either.

In addition, Gaines argues that Wellpath's failure to reprimand Defendant Meadows for her late entry and "her own dismissiveness of this egregious breach of care" constitute ratification of illegal acts.  Gaines Resp. to Wellpath Mot. at PageID.4030 (citing Wright v. City of Euclid,

Ohio, 962 F.3d 852, 882 (6th Cir. 2020) for the proposition that failing to investigate and punish allegations of unconstitutional conduct can be ratification of those acts). But Gaines does not appear to argue that Meadows's late entry was itself a constitutional violation, so it is unclear how a failure to reprimand her for it could constitute ratification of unconstitutional conduct. Meadows's alleged "dismissiveness" of her own conduct also is not official ratification of that conduct.

As a result, summary judgment is granted on the medical indifference claim against Wellpath.

### iii. Gatson and Lucas

The Wayne County Defendants first argue that Gaines cannot succeed on a deliberate indifference claim against Gatson or Lucas because they were not personally involved in the events leading up to Powers's death, and "'[p]ersons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior.'" Wayne Mot. at PageID.3047 (quoting Heyerman v. Cnty. of Calhoun, 680 F.3d 642, 647 (6th Cir. 2012)). While the Wayne County Defendants are correct that § 1983 liability cannot be based on a theory of respondeat superior, see Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999), Gaines does not seek to hold Gatson and Lucas responsible for the conduct of their subordinates. Instead, Gaines argues that they were personally involved because Hunter had explained Powers's behaviors to them, and they failed to intervene to order a psychological assessment or ensure Powers was kept under constant observation. Gaines Resp. to Wayne Mot. at PageID.4670–4671. As a result, a lack of personal involvement is not a basis for granting summary judgment on the medical indifference claims against Gatson and Lucas.

However, Gaines has not attempted to produce any evidence that Gatson and Lucas "knew that [their] failure to respond [to Powers's erratic behavior] would pose a serious risk to [Powers] and ignored that risk." Trozzi, 29 F.4th at 757–758. As a result, summary judgment is granted as to the medical indifference claims against Gatson and Lucas.

### iv. Davis, Hunter, and Maddox

The Wayne County Defendants argue that summary judgment should be granted in their favor on the deliberate indifference claims against Davis, Hunter, and Maddox because (i) Gaines cannot establish that Powers had a serious medical need, and (ii) even if Powers had a serious medical need, these individuals did not demonstrate reckless disregard toward that need. Wayne Mot. at PageID.3050; Wayne Reply at PageID.5242.

### a. Serious Medical Need

The Wayne County Defendants point out that although Powers was diagnosed with kidney disease and liver cancer, there are no allegations that these conditions led to Powers's death on December 12, 2017. Wayne Mot. at PageID.3050. They argue that this analysis must then "turn on whether a non-visible dialysis port is an objectively serious medical need in and of itself." Id. at PageID.3051. But Gaines does not argue that a non-visible dialysis port is in and of itself a serious medical need that required constant observation. Instead, Gaines appears to argue that Powers had a serious medical need because he was behaving erratically despite previously model behavior. See Gaines Resp. to Wayne Mot. at PageID.4671.

Gaines, however, does not provide caselaw supporting the notion that erratic behavior by someone with underlying medical conditions can constitute a serious medical need where that person previously behaved as a "model inmate." In Gaines's response brief, he asserted that expert testimony from Dr. Aaron Westrick would support this argument, Pl. Resp. to Wayne Mot. at

17

PageID.4671, but this Court has precluded testimony from Dr. Westrick, see Op. and Order Granting Motion to Exclude Pl.'s Experts (Dkt. 104); Order Denying Mot. for Reconsideration (Dkt. 120).[11] The record does not reflect that Gaines presented with an obvious medical need so serious as to invoke the protections of the Fourteenth Amendment. As a result, Gaines has not met his burden of coming forward with evidence showing that there is a genuine issue for trial as to whether Gaines had a serious medical need. See Celotex Corp., 477 U.S. at 324–325.

**b. Reckless Disregard**

The Wayne County Defendants also argue that even if Powers had a serious medical need, these individuals did not demonstrate reckless disregard toward that need. The Court agrees.

Davis, for example, observed that Powers appeared to be frustrated on December 11, 2017, but did not appear to be a danger to himself or others, and Powers did not ask Davis for any medical attention. Regardless, Davis responded reasonably because he informed his supervisor about Powers's behavior. While Gaines argues that Davis could have sought a psychological assessment for Powers or placed Powers in a cell with more frequent monitoring because Powers was demonstrating unusual behavior, Gaines Resp. to Wayne Mot. at PageID.4670, the failure to do so does not constitute reckless disregard toward Powers's behavior when Davis took other affirmative steps to highlight that behavior to a supervisor; he, therefore did not ignore any perceived risk to Powers. See Trozzi, 29 F.4th at 757–758.

Hunter, after receiving repeated reports from Powers's roommates regarding his behavior, called the nursing staff and requested a medical assessment, even though Hunter had not himself

---

[11] Expert testimony from Dr. Westrick was precluded because his experience in the fields of law enforcement and criminal justice generally did not qualify him to testify as an expert as to the duties of correctional officers to monitor and care for the medical needs of incarcerated individuals specifically. Op. and Order Granting Motion to Exclude Pl.'s Experts at PageID.5267–5268; Order Denying Mot. for Reconsideration at PageID.5381–5383.

seen Powers behave erratically. This hardly shows that Hunter ignored or failed to respond to any perceived risk to Powers. See id. And after Meadows indicated that Powers was "fine," Hunter concluded that there was a behavioral, rather than a medical, issue and moved Powers to a medical holding cell out of concern for his safety. Hunter Dep. at PageID.4193; Maddox Dep. at PageID.3172–3173. A "non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he reasonably deferred to the medical professionals' opinions." McGaw v. Sevier Cnty., Tenn., 715 F. App'x 495, 498 (6th Cir. 2017) (punctuation modified). Hunter, therefore, did not recklessly disregard risks to Powers's medical needs.

As for Maddox, she testified that during her one interaction with Powers, the latter did not "give any type of indication . . . [that he was] in any kind of trouble." Maddox Dep. at PageID.3176. Maddox also was aware that Powers had been evaluated by medical staff. Id. at PageID.3172–3173. Gaines argues that Maddox should have told the nursing staff or others when she "saw [Powers] standing in the holding cell and mumbling to himself," Gaines Resp. to Wayne Mot. at PageID.4671, but he presents no evidence that Maddox "knew that [her] failure to respond would pose a serious risk to [Powers] and ignored that risk." Trozzi, 29 F.4th at 757–757.

The individual Wayne County Defendants are, therefore, entitled to summary judgment on the deliberate indifference claims against them.[12]

**v. Wayne County**

The Wayne County Defendants argue that a municipal liability claim against them fails because a municipal entity cannot be held liable where there is no underlying constitutional violation by an individual officer, which they assert is the case here. Wayne Mot. at PageID.3057

---

[12] The individual Wayne County Defendants also assert qualified immunity as a defense. See Wayne Mot. at PageID.3055–3057. Because the Wayne County defendants are entitled to summary judgment on other grounds, the Court need not discuss this defense.

(citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)). They are correct, as "it is well settled that there can be no Monell liability under § 1983 unless there is an underlying unconstitutional act." Thurmond v. County of Wayne, 447 F. App'x 643, 651 (6th Cir. 2011) (punctuation modified).[13] Summary judgment is granted as to the medical indifference claim against Wayne County.

### III. CONCLUSION

The motions for summary judgment (Dkts. 84 and 85) are granted in part. Summary judgment is granted as to the Fourteenth Amendment medical indifference claims against the Wellpath Defendants and as to the Fourteenth Amendment medical indifference claims against the Wayne County Defendants. The Court exercises its discretion to decline to exercise supplemental jurisdiction over the remaining state-law claims by dismissing these claims without prejudice. 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726–727 (1966) ("[I]f the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

SO ORDERED.

Dated: November 29, 2022           s/Mark A. Goldsmith
       Detroit, Michigan           MARK A. GOLDSMITH
                                   United States District Judge

---

[13] The Wayne County Defendants argue, in the alternative, that even if Gaines could prove a constitutional violation, he cannot produce any evidence that a violation was the result of Wayne County policy or custom. Because summary judgment is granted on other grounds, the Court finds it unnecessary to address this alternative argument.

20